**Ruth O. SHAW, et al., Plaintiffs,**

**v.**

**William BARR, et al., Defendants.**

**Civ. A. No. 92–202–CIV–5–BR.**

United States District Court,
E.D. North Carolina,
Raleigh Division.

Aug. 7, 1992.

Robinson O. Everett, Durham, NC, for plaintiffs.

Margaret Person Currin, U.S. Atty., R.A. Renfer, Asst. U.S. Atty., E.D.N.C., Raleigh, NC, John R. Dunne, Asst. Atty. Gen., Steven H. Rosenbaum, J. Gerald Herbert, and Rebecca J. Wertz, Attorneys, Voting Section Civ. Rights Div., U.S. Dept. of Justice, Washington, DC, for federal defendants.

Lacy H. Thornburg, Atty. Gen., Edwin M. Speas, Jr., Sr. Deputy Atty. Gen., H. Jefferson Powell, Sp. Counsel to Atty. Gen., Tiare B. Smiley, Norma S. Harrell, Daniel F. McLawhorn, Sp. Deputy Attys. Gen., N.C. Dept. of Justice, Raleigh, NC, for state defendants.

Before PHILLIPS, Circuit Judge, BRITT, District Judge [*], and RICHARD L. VOORHEES, Chief District Judge.[**]

## MEMORANDUM OPINION

PHILLIPS, Circuit Judge, with whom BRITT, District Judge, joins:

Plaintiffs Ruth O. Shaw, Melvin G. Shimm, Robinson O. Everett, James M. Everett, and Dorothy G. Bullock, all citizens of the State of North Carolina and registered voters in Durham County, brought this action against William Barr, in his

---

[*] of the Eastern District of North Carolina.

[**] of the Western District of North Carolina.

official capacity as Attorney General of the United States, and John Dunne, in his official capacity as Assistant Attorney General of the United States, Civil Rights Division (hereinafter, together, the "federal defendants"), and against various North Carolina state officials and agencies (hereinafter, collectively, the "state defendants"), challenging on constitutional and statutory grounds the congressional redistricting plan adopted by the State of North Carolina. Jurisdiction of this three-judge district court is based on 28 U.S.C. §§ 1331, 1343, and 2284, and 42 U.S.C. §§ 1983 and 1988. The case came before us on motions of both the federal and the state defendants to dismiss the action pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state claims against them upon which relief could be granted, and of the federal defendants to dismiss as well under Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction. Following a hearing on the motions, we concluded that they should be granted, announced our decision orally, and entered an order of dismissal on April 27, 1992. Issuance of a written opinion was deferred in view of the imminence of the Democratic and Republican primary elections scheduled for May 5, 1992.

I

As a result of population increases reflected in the 1990 Decennial Census, North Carolina became entitled to a twelfth seat in the United States House of Representatives. Accordingly, on July 9, 1991, the General Assembly of North Carolina enacted legislation to redistrict the state into twelve congressional districts. The redistricting plan as originally enacted included one district, the First District, that had a majority of black persons of voting age, and of black persons registered to vote. This proposed majority-minority district was centered in the northeastern part of the state.

Because 40 of North Carolina's 100 counties are covered by the special provisions of Section 5 of the Voting Rights Act, the General Assembly submitted its redistricting plan for preclearance by the Attorney General of the United States.[1] On December 18, 1991, the Attorney General, by letter of the Assistant Attorney General, Civil Rights Division, interposed formal objection, under Section 5, to the General Assembly's proposed redistricting plan.

Objection was based on the fact that "the proposed configuration of the district boundary lines in the south-central to southeastern part of the state appear to minimize minority voting strength given the significant minority population in this area of the state." Letter of John R. Dunne, Assistant Attorney General, Civil Rights Division, to Tiare B. Smiley, Special Deputy Attorney General, State of North Carolina (Dec. 18, 1991). It appeared, the letter asserted, that the General Assembly "chose not to give effect to black and Native–American voting strength in this area, even though it seems that boundary lines that were no more irregular than found elsewhere in the proposed plan could have been drawn to recognize such minority concentration in this part of the state." *Id.*[2]

---

1. In jurisdictions covered by the special provisions of Section 5, any change in voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting may be submitted to the United States District Court for the District of Columbia "for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color," or

> be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted ... to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited ap-

proval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made.

42 U.S.C. § 1973c.

2. With regard to the one majority-minority district created in the proposed redistricting plan, it was noted that

> [t]he unusually convoluted shape of that district does not appear to have been necessary to create a majority black district and, indeed, at least one alternative configuration was available that would have been more compact. Nonetheless, we have concluded that the irregular configuration of that district did not have the purpose or effect of minimizing minority voting strength in that region.

> *Id.*

It was also noted that the General Assembly

> was well aware of significant interest on the part of the minority community in creating a second majority-minority congressional district in North Carolina. For the south-central to southeast area, there were several plans drawn providing for a second majority-minority congressional district, including at least one alternative presented to the legislature.... These alternatives, and other variations identified in our analysis, appear to provide the minority community with an opportunity to elect a second member of congress of their choice to office, but, despite this fact, such configuration for a second majority-minority congressional district was dismissed for what appears to be pretextual reasons.

*Id.*

In response to the Attorney General's objection to the proposed redistricting plan, the General Assembly enacted the redistricting legislation at issue here (the "Plan") on January 24, 1992. The Plan creates a second majority-minority district, the Twelfth District, not in the south-central to southeast area of North Carolina, where many had advocated locating a second majority-minority district, but in a thin band, sometimes no wider than Interstate Highway 85, some 160 miles long, snaking diagonally across piedmont North Carolina from Durham to Gastonia.[3] As a result of the tortured configuration of the Twelfth District and other features of the Plan, many precincts, counties, and towns in North Carolina are divided among two or even three congressional districts. Plaintiffs are residents of an area that was so affected. Before the challenged redistricting, plaintiffs Shaw, Shimm, Robinson Everett, and Bullock, all residents of Durham County, had been registered to vote in the

Second District. Under the Plan, Shaw and Shimm will vote in the Twelfth District; Robinson Everett and Bullock will continue to vote in the Second District. Plaintiff James Everett, also a resident of Durham County, registered to vote after the Plan was adopted. He will vote in the Twelfth District.

Plaintiffs then brought this action on March 12, 1992, seeking as end relief a permanent injunction against implementation of the Plan on the ground that it is unconstitutional, and in the interim a preliminary injunction and temporary restraining order enjoining the appropriate state defendants from "taking any action in preparation for primary or general elections for the U.S. House of Representatives." Complaint at 16. Following designation of this three-judge court and upon indications that both the state and federal defendants proposed filing motions to dismiss the claims against them on dispositive legal grounds, a scheduling order was entered to permit hearing of the motions before the scheduled primary on May 5, 1992. The matter then came on for hearing on April 27, 1992, as scheduled, and was considered by the court on the pleadings, the motions to dismiss with supporting and opposing legal memoranda, and oral argument of the parties. Because of the imminence of the scheduled primary elections on May 5, 1992, we announced orally our decision to grant the motions and entered an order of dismissal on April 27, 1992, deferring issuance of a written opinion. Our reasons for decision follow.

## II

Preliminarily, we note that in entertaining and deciding motions to dismiss on the merits or on subject matter jurisdiction grounds on the basis of bare-bones pleadings, courts are under special obligation to construe the pleadings liberally in favor of the pleader, especially in considering motions to dismiss for failure to state claims

---

**3.** In creating the Plan, the Democratically controlled General Assembly rejected plans offered by both Republicans and nonpartisan groups for locating the second majority-minority district in the south-central to southeast part of the state.

The Republican Party of North Carolina and various other plaintiffs lodged a political gerry-

mandering attack on the Plan, contending primarily that rejection of their proposed plans in favor of that adopted was motivated essentially by an intent to protect Democrat incumbents. That suit recently was dismissed by another three-judge district court. *Pope v. Blue,* 809 F.Supp. 392 (W.D.N.C.1992).

under Fed.R.Civ.P. 12(b)(6). *See generally* 5A C. Wright & A. Miller, *Federal Practice and Procedure: Civil 2d* § 1357 (1990) (hereinafter *Wright & Miller*). Indeed, where any perceived pleading insufficiency relates only to factual matters, dismissal on the merits is ordinarily inappropriate, with leave to amend and deferral of decision to summary judgment or trial on appropriately amended pleadings and discovery materials being the appropriate course. *Id.* at 360–67. When, however, it is apparent from the pleadings, motions, legal memoranda, matters of public record, and other matters properly within the range of judicial notice, that only legal issues are presented, decision on the merits may be appropriate without the need for further factual development, whether by pleading amendment, discovery, or evidentiary proceedings. This is true even where decision requires analysis of difficult constitutional issues and involves rejection of constitutional claims asserted by the pleader on their basis. *See, e.g., United Jewish Organizations, Inc. v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1976) (constitutional voting rights claim); *Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (constitutional "privacy" claim). In considering whether a pleading is thus legally rather than merely factually insufficient, however, a court must in fairness at this early stage inquire whether the allegations could support relief on *any* legal theory within the range of reason and the ultimate constraints of the adversarial process. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Harrison v. U.S. Postal Service,* 840 F.2d 1149, 1152 (4th Cir.1988).

We have considered the claims here in light of these general principles and the related familiar ones that all purely factual allegations, but not legal conclusions, in the complaint are to be taken as true, etc. 5A *Wright & Miller* § 1357, at 304–21.

## III

We first address the claim alleged against the federal defendants and challenged by their motions to dismiss on jurisdictional and merits grounds.

The gist of this claim as pleaded is that in first declining to preclear North Carolina's original redistricting plan, which included only one majority-black district, then preclearing the one here under specific attack which has two, Attorney General Barr and Assistant Attorney General Dunne made an "unconstitutional interpretation and application of the Voting Rights Act." Complaint at 2. This unconstitutional action by the federal defendants is then alleged to have "coerce[d] the [state] defendants into adopting and implementing an unconstitutional plan of redistricting." *Id.* at 3. As fleshed out somewhat in plaintiffs' legal memorandum, the underlying legal theory of the claim is that in their successive acts of denying preclearance of the first plan, then preclearing the second plan they successfully had "coerced," the federal defendants had either misinterpreted 42 U.S.C. § 1973(b), amended Section 2 of the Voting Rights Act, and in consequence applied it unconstitutionally or, if they interpreted it correctly, had applied a facially unconstitutional provision of the Act to accomplish an unconstitutional end. Complaint at 11; Response to Motion to Dismiss at 5. The unconstitutional end, whether resulting from misinterpretation of a constitutional statute or from application of an unconstitutional statute, is alleged to be the intentional concentration of majority populations of black voters in districts that are in no way related to considerations of compactness, contiguousness, or jurisdictional communities of interest. This appears from the prayer for relief against the federal defendants, which is that they be enjoined from

imposing, directly or indirectly, any preclearance requirement that any Congressional District in the State of North Carolina have a majority population of persons in any particular race or color, and ... from taking any action, whether under the Voting Rights Act, or otherwise, to establish or to encourage or require establishment of, a redistricting plan whereunder persons of a particular race or color ... would be concentrated in a Congressional district that is in no way related to considerations of commpactness [*sic*], contiguousness and geograph-

ic or jurisdictional communities of interest.

Complaint at 15.

In essence then, this claim attempts to attack the constitutionality of the Voting Rights Act—most specifically, amended Section 2 of the Act—either facially or as applied, by challenging the actions of the named federal defendants taken under Section 5 of the Act to enforce its provisions.

The federal defendants' motion to dismiss this claim is based on two grounds: (1) that under Section 14(b) of the Voting Rights Act, 42 U.S.C. § 1973*l*(b), this court lacks subject matter jurisdiction to entertain it, and (2) that to the extent it seeks judicial review of the Attorney General's actions taken pursuant to Section 5 of the Voting Rights Act, it does not state a cognizable federal claim.

We consider these in turn. Because the exact nature of the plaintiffs' claim of unconstitutionality is not relevant to the grounds upon which the motion to dismiss is made, we need not attempt to identify them in considering this motion.

### A

■ Section 14(b) of the Voting Rights Act provides in pertinent part that

> [n]o court other than the District Court for the District of Columbia ... shall have jurisdiction to issue any ... restraining order or temporary or permanent injunction against the execution or enforcement of [Section 5, *inter alia*] or any action of any Federal Officer or employee pursuant thereto.

The federal defendants contend that this provision plainly confers exclusive original jurisdiction of a claim such as plaintiffs' upon the District Court for the District of Columbia, and that this court therefore lacks subject matter jurisdiction to hear the claim. We agree.

Section 14(b) is a concededly drastic jurisdictional limitation which has nevertheless been upheld by the Supreme Court against due process challenge. *South Carolina v. Katzenbach*, 383 U.S. 301, 331, 86 S.Ct. 803, 820, 15 L.Ed.2d 769 (1966). As inter-

preted, it applies to any action, whether brought by a governmental or private litigant, that raises "substantive discrimination" questions, including, of course, challenges to the Act's very constitutionality, as contrasted to actions that seek merely to determine the "coverage" of various provisions of the Act in advance of specific applications. *Compare Allen v. State Board of Elections*, 393 U.S. 544, 558–59, 89 S.Ct. 817, 827–28, 22 L.Ed.2d 1 (1969) (action by private litigant for declaratory judgment as to § 5 coverage of particular state enactment not subject to § 14(b) limitation) *with Reich v. Larson*, 695 F.2d 1147, 1149–50 (9th Cir.1983) (action by private litigant challenging constitutionality of Voting Rights requirement for bilingual printing of candidacy statements subject to § 14(b) jurisdictional limitation; *Allen* action distinguished). *See also McCann v. Paris*, 244 F.Supp. 870, 872–73 (W.D.Va. 1965) (§ 14(b) covers action by private litigants challenging that provision's own constitutionality).

Within these interpretations, the plaintiffs' action plainly is covered by Section 14(b). It specifically challenges the constitutionality of the Voting Rights Act by attacking the actions of federal officials in enforcing the provisions of Section 5. The relief sought is precisely the issuance of injunctive decrees against this and comparable future acts of enforcement.

Plaintiffs have sought to avoid Section 14(b)'s limitation by amending their prayer for relief to seek declaratory relief in addition to the injunctive relief originally sought as their sole remedy. This pleading device cannot avoid the Section 14(b) limitation. The relief prayed still rests on a claim of unconstitutionality, and challenges the enforcement efforts of the Attorney General under Section 5.

The action therefore remains of the type contemplated by Section 14(b). *See Allen*, 393 U.S. at 558, 89 S.Ct. at 827 ("The § 14(b) injunction action is one aimed at prohibiting enforcement of the provisions of the Voting Rights Act, and ... involve[s] an attack on the constitutionality of the Act itself."). A mere addition to (or

complete change, had that been attempted) in the form of specific relief prayed cannot undo that critical aspect of the claim. *See Reich*, 695 F.2d at 1149 (action alleging unconstitutionality of Voting Rights provision and seeking "declaratory and other appropriate relief" against its enforcement held subject to Section 14(b)).

Accordingly, we conclude that under Section 14(b), this court lacks subject matter jurisdiction over the claim against the federal defendants. They are entitled on that basis to dismissal of the claim under Fed. R.Civ.P. 12(b)(1).

#### B

The federal defendants also contend that to the extent the claim against them involves a challenge to the Attorney General's exercise of the discretionary power conferred on him by Section 5 to make preclearance decisions, it fails to state a cognizable federal claim. Specifically, they contend that *Morris v. Gressette*, 432 U.S. 491, 97 S.Ct. 2411, 53 L.Ed.2d 506 (1977), long since has established that such discretionary decisions are not subject to judicial review in any court. We agree.

Without belaboring the point, we note that *Morris* makes it in the most emphatic way possible: by conceding that the result is to shield from direct judicial review even the most egregious defaults of an Attorney General, including any that might be prompted by the crassest of political considerations. *Id.* at 506 n. 23, 97 S.Ct. at 2421 n. 23. As the court pointed out (after disclaiming any assumption of such malfeasance), under the concededly drastic provisions of the Voting Rights Act viewed whole, a Section 5 preclearance decision (or non-decision) by the Attorney General, whether up or down, is not the end of the legal road for any person or governmental entity disfavored by it. If objection is in-terposed, the disfavored governmental entity may seek preclearance in a *de novo* judicial proceeding in the District Court for the District of Columbia. If objection is not interposed within the statutory time limit (whether by express decision or non-action) any persons—such as plaintiffs here—who consider their legal or constitutional rights violated by the state enactment thereby freed up may resort to the judicial avenues available for redress against the state enactment and its enforcers. In neither event does the Attorney General's decision have any legally preclusive effect upon the follow-up judicial proceedings. *Id.* at 504–07 & n. 21, 97 S.Ct. at 2420–22 & n. 21.

Plaintiffs' claim as pleaded against the federal defendants, whether viewed as being aimed only at the allegedly "coercive" effect of the challenged preclearance decisions upon later state action, or at the direct effect of these decisions upon plaintiffs' constitutional rights, inescapably is one seeking judicial review of those discretionary decisions. As such it fails to state a cognizable federal claim for relief. Accordingly, on this alternative ground as well as the jurisdictional limitations of Section 14(b), we conclude that the federal defendants are entitled to dismissal of the claim under Fed.R.Civ.P. 12(b)(6) for failure to state a claim. *Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946).

#### IV

The gravamen of the plaintiffs' claim against the state defendants is that the General Assembly of North Carolina acted unconstitutionally in deliberately creating two congressional districts in which black persons constitute majorities of the overall voting-age and registered-voter populations.[4] This claim is expressed in various

---

4. As indicated in Part II, plaintiffs' complaint *actually identifies as the primary unconstitutional conduct* being challenged the action of the federal defendants in "misinterpreting and misapplying" Section 2 of the Voting Rights Act, thereby "coercing" the state defendants into becoming "unwilling participants" in a racially discriminatory, hence unconstitutional, redistricting process. Complaint ¶ 36, at 14. When the state defendants predictably picked up on this "unwilling participant" theory as an implicit concession by plaintiffs of the lack of any "invidious intent" on their part, Memorandum in Support of Motion to Dismiss (hereafter Dismissal Memorandum) at 5, the plaintiffs responded by disclaiming any such effect for the "unwilling participant" theory, dismissing it—with questionable logic, given that it was their

forms and invokes several different constitutional provisions. In its most sweeping, but simplest, form, it baldly asserts that any state legislative redistricting driven by considerations of race—whatever the race, whatever the specific purpose, whatever the specific effect—is unconstitutional. Response at 5. On this basis, the claim alleges that to the extent the Voting Rights Act authorizes *any* race-conscious legislative redistricting, the Act is facially unconstitutional. Complaint ¶ 35, at 14; Response at 5. In the alternative, plaintiffs' claim seems to assert that in any event, race-based redistricting which is specifically intended to assure proportional representation of minority (or any?) races in Congress and fails properly to observe (undefined) considerations of contiguity, compactness, and communities of interest in drawing congressional districts to achieve that purpose—i.e., racial gerrymandering—is unconstitutional. On this basis, the claim asserts that in deliberately creating two black-voter majority congressional districts, the redistricting plan here challenged has both those vices, hence constitutes an unconstitutional application of the Voting Rights Act. Complaint at 15; Response at 3, 4. This claim, whatever its specific form, is grounded expressly in a number of constitutional provisions: the Equal Protection Clause of the Fourteenth Amendment; the Fifteenth Amendment; the Privileges and Immunities Clause of the Fourteenth Amendment; Article I, Section 2; and Article I, Section 4. Each of these provisions is alleged, in one way or another relevant to its particular function, either to prohibit any race-conscious creation of congressional districts by state legislatures, or to prohibit the gerrymandered forms here challenged. We will consider these in turn, but in reverse order because, as will appear, we think the equal

protection claim the only relevant, or most inclusive, one under developed constitutional doctrine respecting voting rights.

### A

■ We first consider plaintiffs' claim under Article I, Section 4 of the Constitution. That Section provides that the "Times, Places and Manner of Holding Elections for Senators and Representatives, shall be prescribed in each state by the Legislature thereof; but the Congress may at any time by law make or alter such Regulations, except as to the Places of chusing Senators." The gist of the Article I, Section 4 claim, as we understand it, is that the constitutional provision secures to the North Carolina legislature the right to create congressional districts free of the federal control exercised by the federal defendants here; and that the state's conduct in succumbing to that improperly exercised control violated the derivative right thereby secured to plaintiffs as citizens and registered voters of the state. Complaint ¶¶ 24, 26, at 10, 11; *id.* ¶ 37, at 14, 15.

This, so far as we are aware, is a novel claim in voting rights jurisprudence. No authority for such an interpretation of Article I, Section 4 is suggested, and we decline to recognize the individual right asserted under it. As we read the provision, it is simply a positive grant of power to the states to "prescribe" their own voting processes, subject only to congressional override of particular "regulations." To the extent the Voting Rights Act is an exercise of congressional override power, it operates to validate, rather than restrict, the state's redistricting action here. We do not read the provision to impose any structural limitation on either the state's primary power to "prescribe" its electoral processes

own—as the state defendants' "devil-made-me-do-it" theory. Response at 24.

Though the anomaly is plain and may suggest a general weakness in plaintiffs' "derivative liability" theory, we do not ascribe it any ultimate significance in assessing the existence of invidious intent where that is an essential element of plaintiffs' claim. *See* Part IV(C)(2) *infra.*

A related possibility arising from this "derivative-liability" theory—that the federal defen-

dants might be necessary parties to the claim against the "unwilling" state defendants—is not urged by the plaintiffs. *Cf. United Jewish Organizations,* 430 U.S. at 153–54 n. 13, 97 S.Ct. at 1003–04 n. 13. The only basis upon which the federal defendants are sought to be held in this action is as proper parties to the claim directly against them.

or on Congress's override power of control. There undoubtedly are constitutional limits on both, but they do not arise from Article I, Section 4 itself.

## B

■ We next consider plaintiffs' claim under Article I, Section 2 of the Constitution, which provides that "[t]he House of Representatives shall be composed every second year by the people of the several states."

The theory plaintiffs seemingly advance is that this direct grant of power to the "people" to "compose" the House of Representatives directly confers upon all registered voters of the state a right to vote for representatives in districts not drawn on a race-conscious basis—a right, as the plaintiffs express it, not to have "the people divided" for this purpose "along racial lines." Complaint ¶¶ 34, 35, at 15; Response at 2, 3.[5]

We read Supreme Court precedent as confining the function of Article I, Section 2 to that of safeguarding the one-person-one-vote principle in matters of congressional redistricting. *See Mahan v. Howell,* 410 U.S. 315, 322, 93 S.Ct. 979, 984, 35 L.Ed.2d 320 (1973) ("population alone ... the sole criterion of constitutionality in congressional redistricting under Article I, Section 2"); *Wesberry v. Sanders,* 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964) (Article I, Section 2 interpreted to require conformance to one-person-one-vote standard in congressional districting). Other lower courts share this understanding. All

asked, so far as we are aware, to find further voting rights protections in this provision have declined to do so on this view of Article I, Section 2's limited equal-population function. *See, e.g., Anne Arundel County Republican Central Committee v. State Administrative Bd. of Election Laws,* 781 F.Supp. 394, 397 (D.Md. 1991) (three-judge court) (Article I, Section 2's protection confined to one-person-one-vote principle; does not extend to claims of political gerrymandering); *Pope v. Blue,* 809 F.Supp. 392, 397–98 (W.D.N.C.1992) (three-judge court) (same); *Badham v. March Fong Eu,* 694 F.Supp. 664, 674–75 (N.D.Cal.1988) (three-judge court) (same), *aff'd mem.* 488 U.S. 1024, 109 S.Ct. 829, 102 L.Ed.2d 962 (1989). Since Article I, Section 2 only proscribes districts of unequal population and plaintiffs make no such claim here, the claims they do make, accordingly, are not supported by Article I, Section 2.

## C

■ We consider finally the allegations that the state's redistricting plan violates rights secured to plaintiffs by the Equal Protection and Privileges and Immunities Clauses of the Fourteenth Amendment, and by the Fifteenth Amendment. Because we think the Privileges and Immunities Clause inapposite to this voting rights claim,[6] and the Fifteenth Amendment's protection essentially subsumed within that provided by the Equal Protection Clause,[7] we confine analysis to the equal protection allegations.

**5.** This right is claimed not only to be directly secured to individual citizens by Article I, Section 2, but also to be further protected by the Privileges and Immunities Clause of the Fourteenth Amendment and by the Fifteenth Amendment. Complaint ¶¶ 34, 35, at 13, 14.

**6.** Plaintiffs cite no authority for their assertion, Complaint ¶ 34, at 13, 14, that the right to vote for members of Congress is a "privilege" of national citizenship within the meaning of this clause. In the few cases of which we have been made aware in which the assertion has been made, it has been rejected. *See, e.g., Pope v. Williams,* 193 U.S. 621, 632, 24 S.Ct. 573, 575, 48 L.Ed. 817 (1904); *Minor v. Happersett,* 88 U.S. (21 Wall.) 162, 172–78, 22 L.Ed. 627 (1875). In any event, if this particular voting right were

considered such a "privilege," its protection under this Clause could be no broader than that provided by the Equal Protection Clause, hence we do not consider it separately.

**7.** Racial gerrymandering and vote dilution claims (of which plaintiffs' claim must surely be considered some "reverse" variety) have generally been treated as subject to the same analysis under the Equal Protection Clause and the Fifteenth Amendment. The essence of such a claim under either is state action that invidiously discriminates against the voting rights of some of the states' citizens on account of their race. *See, e.g., Rogers v. Lodge,* 458 U.S. 613, 621, 102 S.Ct. 3272, 3277, 73 L.Ed.2d 1012 (1982); *Whitcomb v. Chavis,* 403 U.S. 124, 149,

At the outset of our consideration of the equal protection claim, we note one puzzling aspect of the plaintiffs' statement of that claim. They nowhere identify themselves as members of a different race than that of the black voters in whose behalf the challenged congressional districts allegedly (and concededly) were created. Nor, following this, do they plainly allege constitutional injury specific to their rights as members of a particular racial classification of voters. Indeed, in describing the constitutional injury allegedly caused by the race-conscious redistricting plan, they assert that it is injury suffered alike by "plaintiffs and all other citizens and registered voters of North Carolina—whether black, white, native American, or others." Complaint ¶ 29, at 12; *id.* ¶ 32, at 13. And in specifically alleging the equal protection injury, plaintiffs assert that it falls on "plaintiffs and all other voters." *Id.* ¶ 35, at 14. Only in alleging the Fifteenth Amendment injury do they seem to confine its impact to members "of the race or color of the plaintiffs." *Id.* ¶ 36, at 14.

We could, of course, interpret this as a deliberate (and humanly, if not legally, laudable) refusal to inject their own race[s] into a claim whose essence is to deplore race-consciousness in voting-rights matters. But we are reluctant to make that assumption in view of its implications for the case in its present posture. Constitutional injury to "all voters" of a state cannot of course constitute invidious racial discrimination against some voters only, hence a denial of equal voting rights protection, and such a claim would therefore be self-defeating at the threshold. While we may be doing plaintiffs' intentions (if not their legal cause) a disservice, we therefore believe it appropriate to assume that the critical allegation here is that which (implicitly at least) rests plaintiffs' Fifteenth Amendment claim on their identities as white voters (a fact of which we take judicial notice).

Construed as a challenge by white voters to the state's redistricting plan on the basis that it violates their equal protection (and parallel Fifteenth Amendment) rights by virtue of its race-conscious creation of two black-majority congressional districts, the complaint fails to state a legally cognizable claim. As indicated, the challenge is made on alternative grounds: that any race-conscious redistricting is *per se* unconstitutional, and that to the extent the Voting Rights Act authorizes it, the Act is facially unconstitutional, or that, alternatively, the specifically challenged redistricting plan here involves an unconstitutional application of the Voting Rights Act because it fails to observe requirements of compactness, contiguity, and communities of interest, and was driven only by concerns to assure proportional representation of black citizens in North Carolina's congressional delegation. We take these in order, noting at the outset that the fact of "race-consciousness" in the legislative creation of the two black-majority congressional districts is established for purposes of decision in this case. Not only is the plaintiffs' allegation to that effect entitled to acceptance as a procedural matter, the state defendants formally concede that the state legislature deliberately created the two districts in a way to assure black-voter majorities and thereby comply with requirements of the Voting Rights Act. Dismissal Memorandum at 12.

(1)

■ The broad claim of *per se* unconstitutionality solely because of the form of race-consciousness in redistricting at issue here is flatly foreclosed by Supreme Court precedent. Most directly in point, *United Jewish Organizations, Inc. v. Carey*, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977) (hereafter *UJO*), still stands as direct rejection of the contention, at least where, as here, a state legislature's racially conscious purpose is to meet the broad remedial requirements of the Voting Rights Act. In dismissing a Fourteenth and Fifteenth Amendment vote-dilution challenge by white voters to the New York

91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971). If there is any significant difference, the protection afforded by the Equal Protection Clause is the broader. *See Mobile v. Bolden*, 446 U.S. 55, 61–65, 100 S.Ct. 1490, 1496–99, 64 L.Ed.2d 47 (1980) (plurality opinion). We therefore do not consider the Fifteenth Amendment claim separately.

legislature's deliberate creation of a number of black-majority state legislative districts, Justice White, for a four-Justice plurality, specifically noted that "compliance with the [Voting Rights] Act in reapportionment cases [will] often necessitate the use of racial considerations in drawing district lines." *Id.* at 159, 97 S.Ct. at 1006. Thus, the plurality added,

> the Constitution does not prevent a state subject to the Voting Rights Act from deliberately creating or preserving black majorities in particular districts in order to ensure that its reapportionment plan complies with [the Voting Rights Act].

*Id.* at 161, 97 S.Ct. at 1007.[8]

Plaintiffs offer no valid basis for our disregarding *UJO*'s rejection of their "unconstitutional *per se*" challenge to the Plan. They address *UJO*'s facially apparent *stare decisis* effect only by suggesting that in light of four later Supreme Court decisions and the fact that "there was no majority opinion," they "doubt that even the court's judgment would be the same today as it was fifteen years ago." Response at 21. The four later Supreme Court decisions relied on, *Powers v. Ohio*, 499 U.S. ——, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); *Metro Broadcasting, Inc. v. F.C.C.*, 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990); *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989); and *Freeman v. Pitts*, —— U.S. ——, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992) are said to reveal such a new commitment by the Supreme Court to the "color-blind constitution" concept, that they have effectively undercut *UJO*'s authority.

Response at 12–21. This surely is permissible advocacy, but as surely is not an acceptable basis for judicially disregarding *UJO*'s continued authority. Indeed, we see in these decisions no such intimation of a new constitutional perspective on the *UJO* voting rights issue as plaintiffs claim to see. None dealt directly with that voting rights issue. *Powers* dealt with the constitutionality of racially-motivated juror challenges; *Metro Broadcasting*, with racial set-asides of federal broadcast licenses; *Croson*, with a racial set-aside program for municipal public contracts; and *Freeman*, with state school desegregation decisions. All, it is fair to say, revealed varying degrees of concern about the inherent dangers of all race-conscious remedial measures—a concern undoubtedly shared by all thoughtful citizens who have pondered the matter. But none can be interpreted to reflect either a general rejection of all such measures as now seen to be *per se* unconstitutional, nor, even more surely, as a rejection of race-conscious redistricting by states acting under the mandate of the Voting Rights Act. Indeed, one of the decisions expressly indicates continued acceptance of *UJO*'s authority on the specific voting rights issue. In *Metro Broadcasting*, decided in 1990, the Court, citing *UJO*, said that "a state subject to § 5 ... may 'deliberately creat[e] or preserv[e] black majorities in particular districts in order to ensure that its reapportionment plan complies with Section 5.'" 497 U.S. at 584, 110 S.Ct. at 3019. And in *Croson*, decided in 1989, a majority of the Justices expressly

---

8. Seven of the eight Justices deciding the case (including five of the present members of the Court) joined either expressly or by necessary implication in rejecting the unconstitutional *per se* contention. *See id.* 430 U.S. at 155–62, 97 S.Ct. at 1004–08 (opinion of White, J., joined by Brennan, Blackmun and Stevens, J.J.); *id.* at 165–68, 97 S.Ct. at 1010–11 (opinion of White, J., joined by Rehnquist and Stevens, J.J.); *id.* at 179, 97 S.Ct. at 1016 (opinion of Stewart, J., joined by Powell, J.). Four expressly accepted the argument that constitutionality was established by the state's purpose of compliance with Voting Act requirements. *Id.* at 164–65, 97 S.Ct. at 1009–10 (opinion of White, J., joined by Brennan, Blackmun and Stevens, J.J.). Four thought constitutionality established, without regard to the Voting Rights Act, by the complaint's failure to allege, as an essential element of the white voters' constitutional vote-dilution claim, either a discriminatory purpose in or effect from the challenged redistricting. *See id.* at 165, 97 S.Ct. at 1010 (opinion of White, J., joined by Rehnquist and Stevens, J.J.) ("no fencing out of the white population from participation in the political process"); *id.* at 179–80, 97 S.Ct. at 1016–17 (opinion of Stewart, J., joined by Powell, J.) (no showing "that the legislative reapportionment had either the purpose or effect of discriminating against [the white plaintiffs] on the basis of their race"; Voting Rights Act purpose only relevant as negating "invidious purpose of discriminating against white voters").

reaffirmed the constitutionality of a federal racial set-aside program similar to the municipal one held to be unconstitutionally based. 488 U.S. at 490, 109 S.Ct. at 719 (O'Connor, J.); *id.* at 521–23, 109 S.Ct. at 735–37 (Scalia, J., concurring in the judgment); *id.* at 557–58, 109 S.Ct. at 755–56 (Marshall, J., dissenting).

We therefore conclude that *UJO* still stands as authority for rejection of plaintiffs' "unconstitutional *per se* " challenge to the Plan.

### (2)

■ Turning to the as-applied challenge, we find it equally lacking in merit. To recapitulate, the contention is that if not *per se* unconstitutional because of its conceded race-conscious purpose, the specific action here challenged—the creation of two racially gerrymandered congressional districts—is unconstitutional because it was undertaken solely to ensure proportional representation for black citizens in the state's congressional delegation, and without observing any considerations of geographical compactness and contiguity and of communities of interest among district residents.

By this, plaintiffs seem to be asserting that to the extent any race-conscious redistricting is justified by the requirements of the Voting Rights Act, no more is justified than is *required* by the Act.[9] That is to say, the constitutional limits of a state's remedial powers deliberately to create black—(or other minority)—majority districts is determined by the extent to which minority voters could prove entitlement to such districts under the Constitution or the Voting Rights Act. Here, the contention apparently is that black voters could not have established entitlement to the two challenged districts because of their "grotesque" noncompactness (their obviously gerrymandered configurations), hence the legislature acted unconstitutionally in creating them for the avowed purpose of com-

plying with the Voting Rights Act (or the Attorney General's apparent interpretation of the Act's requirements).

If required to rest decision upon this contention, we might be disposed to reject its basic premise. *See McGhee v. Granville County,* 860 F.2d 110, 120 (4th Cir. 1988) (legislative remedial powers not limited by extent of provable Section 2 right); *see also UJO,* 430 U.S. at 165, 97 S.Ct. at 1009 (plurality opinion) (remedial action by legislature not dependent for constitutionality upon authority of or compliance with Voting Rights Act); *id.* at 180 n. *, 97 S.Ct. at 1017 n. * (Stewart, J., concurring) (same). We choose, however, to rest decision on another, plainer, basis.

Simply put, just as in *UJO,* the plaintiffs here have not alleged—nor could they prove under the circumstances properly before us on this record—an essential element of their equal protection (and parallel Fifteenth Amendment) claim: that the redistricting plan was adopted with the purpose and effect of discriminating against white voters such as plaintiffs on account of their race. *See UJO,* 430 U.S. at 165–68, 97 S.Ct. at 1009–12 (plurality opinion); *id.* at 179–80, 1016–17 (Stewart, J., concurring). The requisite intent, for equal protection and Fifteenth Amendment purposes, is a legislative intent to deprive white voters, including plaintiffs, of an equal opportunity with all other racial groups of voters—on a statewide basis—to participate in the political process and to elect candidates of their choice. *See id.* While it is sadly the case in contemporary society that such an intent might be judicially inferred were the state legislature controlled by a black majority, *cf. Croson,* 488 U.S. at 495–96, 109 S.Ct. at 721–22 (opinion of O'Connor, J.), that, as a matter of judicial notice, obviously is not the fact here.

---

9. This seems indicated by the plaintiffs' invocation of Section 2's "no-proportional-representation" disclaimer, and the "compactness" precondition found implicit in the statutory right by the Supreme Court in *Thornburg v. Gingles,* 478 U.S. 30, 50–51 & nn. 16–17, 106 S.Ct. 2752, 2766–

67 & nn. 16–17, 92 L.Ed.2d 25 (1986), and by the plaintiffs' reliance on Judge Eisele's recent exhaustive opinion rejecting *black voters'* challenge to a state congressional redistricting plan in *Turner v. Arkansas,* 784 F.Supp. 553 (E.D.Ark. 1991).

Plaintiffs seem to contend that it is enough to allege and prove an intent to favor black voters—that this necessarily involves an opposing intent to disfavor white voters in the required constitutional sense. But this of course is not the constitutional equation, nor the meaning of "invidious" discrimination in equal protection jurisprudence. The one intent may exist without the other. *See UJO*, 430 U.S. at 165, 97 S.Ct. at 1009 (plurality opinion). And by plaintiffs' own version of the legislative intent here—to comply with the Voting Rights Act—the necessary invidious intent to harm them in the constitutional sense as white voters simply is not possible to prove. *See id.* at 180, 97 S.Ct. at 1017 (Stewart, J., concurring).

Neither have they alleged, nor could plaintiffs prove, the requisite unconstitutional effect under the facts indisputably before us on this motion. That is to say, they cannot establish that creation of the two "grotesque" black-majority districts—however offensive it may be to their general notions of good constitutional government—has operated to "fenc[e] out the white population of the [state, or either of the two challenged districts] from participation in the political processes of the [state or districts], [nor to] minimize or unfairly cancel out white voting strength." *Id.* at 165, 97 S.Ct. at 1009 (plurality opinion). The plan demonstrably will not lead to proportional underrepresentation of white voters on a statewide basis. *See id.* at 166, 97 S.Ct. at 1010 (plurality opinion). Within the specifically challenged districts (in only one of which do any of the plaintiffs, and then only two of the five, reside), the mere fact that white voters (assuming the sad continuation for yet another season of racial bloc voting) will elect fewer candidates of their choice than if they were in white-majority districts is not a cognizable constitutional abridgement of their right to vote, and the two plaintiffs who alone are registered to vote in one of the challenged districts, the Twelfth, will suffer no cognizable constitutional injury if her or his particular candidate should lose by virtue of the district's racial composition. *See id.; see also Davis v. Bandemer*, 478 U.S. 109,

129–34, 106 S.Ct. 2797, 2808–11, 92 L.Ed.2d 85 (1986) (comparable analysis of political gerrymandering claim). We therefore conclude that the plaintiffs' complaint fails to state a claim upon which relief can be granted under the Equal Protection Clause or the Fifteenth Amendment.

V

In this "racial gerrymandering" case, plaintiffs have raised a number of questions about the political and social wisdom of the North Carolina congressional redistricting plan's creation of two tortuously configured black-majority districts. The questions they have raised, however, are in the end political ones. Though legally justiciable, none of their specific claims of constitutional violation has merit. The constitutional provisions invoked either do not secure the specific individual voting rights asserted for them, or in the case of the traditional "vote-dilution" sources—the Fourteenth and Fifteenth Amendments—fail for want of facts from which the requisite discriminatory purpose and effect required to establish violation could be found.

This does not mean that a "reverse discrimination" vote-dilution case may never lie against any state redistricting plan, whether undertaken to ensure compliance with the Voting Rights Act, or independently of that Act's compulsions. It only means that plaintiffs asserting such a claim must establish the requisite discriminatory purpose and effect upon them as individuals or a cognizable group that is required by constitutional voting rights jurisprudence.

Because the complaint fails to state a claim for relief under any of the constitutional provisions invoked, this action is subject to dismissal on the merits, and it has been so ordered.

Richard L. VOORHEES, Chief District Judge, concurring in part, and dissenting in part.

I concur in Parts I, II, III(A), IV(A), IV(B), and IV(C)(1) of the majority opinion.

However, I feel compelled to register my disagreement with its other portions.

## I

Because this Court lacks subject matter jurisdiction as to Defendants Barr and Dunne (the "Federal Defendants"), *see ante*, at Part III(A), I find it inappropriate for the majority to consider, as it did *ante* in Part III(B), the merits of the Federal Defendants' "discretionary power" defense under *Morris v. Gressette*, 432 U.S. 491, 97 S.Ct. 2411, 53 L.Ed.2d 506 (1977), and to grant an alternative dismissal under Fed. R.Civ.P. 12(b)(6). "A dismissal under both rule 12(b)(1) and 12(b)(6) has a 'fatal inconsistency' and cannot stand." *Ehm v. National R.R. Passenger Corp.*, 732 F.2d 1250, 1257 (5th Cir.), *cert. denied*, 469 U.S. 982, 105 S.Ct. 387, 83 L.Ed.2d 322 (1984) (quoting *Opelika Nursing Home, Inc. v. Richardson*, 448 F.2d 658, 667 (5th Cir. 1971)). Once a district court has refused to assert jurisdiction over any controversy, consideration of the merits of the cause of action or whether relief may be properly granted thereunder is beyond the scope of the court's authority. *See, e.g., Rhodes v. United States*, 760 F.2d 1180, 1186 (11th Cir.1985); *Local 1498, Am. Fed'n of Gov't Employees v. American Fed'n of Gov't Employees*, 522 F.2d 486, 492 (3rd Cir. 1975). I would prefer the Rule 12(b)(1) dismissal of the Federal Defendants described in Part III(A) *ante*, due to the jurisdictional limitations set forth in the Voting Rights Act, 42 U.S.C. § 1973*l*(b), without any discussion of substantive defenses or Rule 12(b)(6). *Reich v. Larson*, 695 F.2d 1147 (9th Cir.), *cert. denied*, 461 U.S. 915, 103 S.Ct. 1894, 77 L.Ed.2d 284 (1983); *O'Keefe v. New York City Bd. of Elections*, 246 F.Supp. 978 (S.D.N.Y.1965); *McCann v. Paris*, 244 F.Supp. 870 (W.D.Va.1965). I therefore dissent from Part III(B) of the majority opinion.

## II

The paramount discord that I must register in opposition to the majority opinion lies in the Rule 12(b)(6) dismissal of this action as to Defendants Martin, Gardner, Blue, Edmisten, Ellis, Allen, Marsh, Turner, Youngblood, and the North Carolina State Board of Elections (the "State Defendants"). I concur generally as to the majority's characterization of Plaintiffs' claims against the State Defendants and its consideration of said claims under Article I, Sections 2 and 4 of the Constitution, *see ante*, at Parts IV(A) and (B), and as to the majority's reliance on the continued binding precedential effect of *United Jewish Organizations, Inc. v. Carey*, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977) ["*U.J.O.*"], in rejecting the attack on the Voting Rights Act as unconstitutional *per se, see ante*, at Part IV(C)(1). However, I disagree with the majority's adherence to an interpretation of *U.J.O.*, as advanced by the State Defendants, that would give the North Carolina legislature unbridled discretion to implement race-conscious reapportionment plans. *See ante*, at Part IV(C)(2). The majority would characterize such unchecked discretion as being, in the end, "political," and therefore beyond the reach of this Court in the circumstances presented by this case. *See ante*, at Part V, at 29.

That *de facto* interpretation, given the egregious form the purported implementation of the Voting Rights Act takes here (and which form we are required to assume exists here, taking the amended complaint in the light most favorable to Plaintiffs), is not ameliorated by the disclaimer lodged *ante* at Part V. By that section, the majority would leave the door ajar to theoretical future reverse discrimination plaintiffs to attack a state redistricting plan, albeit on unspecified grounds. This is difficult to square with the majority's finding elsewhere that so long as the state legislative intent is to comply with the Voting Rights Act, "the necessary invidious intent to harm [plaintiffs] in the constitutional sense as white voters simply is not possible to prove." *Id.* at pp. 472–73. Plaintiffs are faulted for failing to bring forth evidence of invidious discrimination against them while they are summarily pre-empted from doing so, even by the most rudimentary processes of discovery.

It is well established that a federal court should deny a Fed.R.Civ.P. 12(b)(6) motion

to dismiss for failure to state a claim "unless it appears *beyond doubt* that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957) (emphasis added). *See also Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *I R Constr. Prods. Co. v. D.R. Allen & Son, Inc.*, 737 F.Supp. 895, 896 (W.D.N.C.1990). Because such dismissal is generally disfavored by the courts, *see, e.g., Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1471 (4th Cir.1991) (citing 2A Moore's Federal Practice, para. 12.07 [2.–5], p. 12–63), a Rule 12(b)(6) motion should be granted sparingly and with great caution.[1] *See, e.g., Rogers v. Jefferson–Pilot Life Ins. Co.*, 883 F.2d 324, 325 (4th Cir.1989); *Huelsman v. Civic Center Corp.*, 873 F.2d 1171, 1174 (8th Cir.1989); *Mize v. Harvey Shapiro Enters., Inc.*, 714 F.Supp. 220, 225 (N.D.Miss.1989). Rule 12(b)(6) does not permit dismissal on the judge's disbelief of the complaint's factual allegations, *see, e.g., Neitzke v. Williams*, 490 U.S. 319, 327, 109 S.Ct. 1827, 1832, 104 L.Ed.2d 338 (1989); *Fusco v. Xerox Corp.*, 676 F.2d 332, 336 (8th Cir.1982), or the difficulty of proof facing the plaintiff, *see, e.g., Haynesworth v. Miller*, 820 F.2d 1245, 1254 n. 73 (D.C.Cir.1987); *Adato v. Kagan*, 599 F.2d 1111, 1117 (2d Cir.1979), or the complaint's vagueness or lack of detail, *see, e.g., Strauss v. Chicago*, 760 F.2d 765, 767 (7th Cir.1985), or the apparent unlikelihood that the plaintiff could succeed on the merits. *See, e.g., Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Revene v. Charles County Comm'rs*, 882 F.2d 870, 872–74 (4th Cir. 1989). Instead, the appropriate inquiry is "whether the claimant is entitled to offer evidence to support the claims." *Scheuer*, 416 U.S. at 236, 94 S.Ct. at 1686. Any doubts should be resolved in favor of discovery and a subsequent trial. *See, e.g., Revene*, 882 F.2d at 873–74; *Action Re-pair, Inc. v. American Broadcasting Co.*, 776 F.2d 143, 149 (7th Cir.1985); *Coakley & Williams, Inc. v. Shatterproof Glass Corp.*, 706 F.2d 456, 457 n. 5 (4th Cir.1983); *Williams v. Gorton*, 529 F.2d 668, 672 (9th Cir.1976), *aff'd without opinion*, 566 F.2d 1186 (9th Cir.1977). Similarly, in the resolution of a Rule 12(b)(6) motion, the nonmoving party has the benefit of all reasonable inferences and the presumed accuracy of all factual allegations contained in the complaint. *See, e.g., Zinermon v. Burch*, 494 U.S. 113, 118, 110 S.Ct. 975, 979, 108 L.Ed.2d 100 (1990); *Scheuer*, 416 U.S. at 236, 94 S.Ct. at 1686; *Jenkins v. McKeithen*, 395 U.S. 411, 421–22, 89 S.Ct. 1843, 1848–49, 23 L.Ed.2d 404 (1969); *A.S. Abell Co. v. Chell*, 412 F.2d 712, 715 (4th Cir. 1969); *Cameron v. Martin Marietta Corp.*, 729 F.Supp. 1529, 1530 (E.D.N.C. 1990); 2A Moore's Federal Practice, para. 12.07 [2.–5], p. 12–63.

## A

The majority opinion in the case at bar has overstated the premise set forth by the *U.J.O.* plurality. While *U.J.O.* establishes race as one factor that may be considered in reapportionment, *see U.J.O.*, 430 U.S. at 159, 97 S.Ct. at 1006 (plurality opinion); *ante*, at Part IV(C)(1), it is not the sole and self-sufficient constitutional criterion. In announcing the plurality's decision, Justice White stated:

> we think it also permissible for a State, *employing sound districting principles such as compactness and population equality*, to attempt to prevent racial minorities from being repeatedly outvoted by creating districts that will afford fair representation to the members of those racial groups who are sufficiently numerous *and whose residential patterns afford the opportunity* of creating districts in which they will be the majority.

*U.J.O.*, 430 U.S. at 168, 97 S.Ct. at 1011 (plurality opinion) (emphasis added). In other words, while a State may engage in

---

**1.** In fact, "[a]s a practical matter, a dismissal under Rule 12(b)(6) is likely to be granted only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." *First Fin. Sav. Bank, Inc. v. American Bankers Ins. Co.*, 699 F.Supp. 1158, 1161 (E.D.N.C.1988).

"deliberately creating or preserving black majorities in particular districts in order to ensure that its reapportionment plan complies with [the Voting Rights Act]," *id.* at 161, 97 S.Ct. at 1007, the State is still obligated to apply traditional and constitutionally-espoused redistricting principles.

The districts in question in this case are, in the word of the majority opinion, "tortured." *Ante,* at 464. The State Defendants' proffered interpretation of *U.J.O.,* countenanced by the majority, has resulted in a First District map which looks like a Rorschach ink-blot test and in a serpentine Twelfth District that slinks down the Interstate Highway 85 corridor until it gobbles in enough enclaves of black neighborhoods to satisfy a predetermined percentage of minority voters.

Plaintiffs' amended complaint explicitly alleges that the State Defendants' creation of the First and Twelfth Districts was done "arbitrarily—without contiguousness, geographical boundaries, or political subdivisions...." Amended Complaint at 1. The State Defendants neither deny nor rebut this charge. Instead, they argue that, because their race-conscious reapportionment was enacted in the context of seeking approval under the Voting Rights Act, the new congressional districts must necessarily be considered to be the result of a legitimate, non-invidious discriminatory legislative purpose and are therefore constitutionally valid under *U.J.O.* State Defendants' Memorandum of Law in Support of Motion to Dismiss at 2, 16; State Defendants' Reply Brief in Support of Their Motion to Dismiss at 2. The majority has apparently embraced this *lex nemini operatur iniquum* defense, notwithstanding its recognition that in *U.J.O.* only "[f]our [Justices] expressly accepted the argument that constitutionality was established by the state's purpose of compliance with Voting Act requirements." *Ante,* at 471 n. 8 (citing

*U.J.O.,* 430 U.S. at 164–65, 97 S.Ct. at 1009–10 (plurality opinion)). *See also ante,* at 470, 472–73. Based upon my reading of the above-quoted passage of the *U.J.O.* plurality opinion, I disagree with the majority's inference that *U.J.O.* has created an absolute defense based on a state legislature's intended compliance with the Voting Rights Act. *See infra* Part II(C).

Disregard by the State Defendants of the "sound districting principles" (as espoused by Justice White, quoted above) in the creation of the First and Twelfth Districts would puncture the *U.J.O.* shield as a justification for the race-conscious reapportionment in question. Time-honored, constitutional concepts of districting, such as contiguity, compactness, communities of interest, residential patterns, and population equality, have maintained their obligatory effect and precedential value as deterrents against equal protection encroachments by way of reapportionment based exclusively on racial criteria. *See, e.g., U.J.O.,* 430 U.S. at 168, 97 S.Ct. at 1011 (plurality opinion).[2] It seems implausible that even the fiercest partisan of the Voting Rights Act would have imagined, at the time of its inception, that the Act gave *carte blanche* to white dominated state legislatures to draw districts virtually immune from judicial review, so long as the cry is raised: "We were only complying with the Voting Rights Act."

The majority correctly observes that mere allegation and proof of an intent to favor minority voters does not, by itself, establish the existence of invidious discrimination against majority race voters. *See ante,* at 472. However, Plaintiffs have shown much more in support of their cause. The Twelfth District careens for almost 160 miles, from the tobacco farms and warehouses of Durham County, through the furniture plants and galleries

2. *See also U.J.O.,* 430 U.S. at 172–73, 97 S.Ct. at 1013–14 (Brennan, J., concurring in part) (discussing the possibility that "a purportedly preferential race assignment may in fact disguise a policy that perpetuates disadvantageous treatment of the plan's supposed beneficiaries"); *Plessy v. Ferguson,* 163 U.S. 537, 560–61, 16 S.Ct. 1138, 1147, 41 L.Ed. 256 (1896) (Harlan, J., dissenting) ("State enactments, regulating the enjoyment of civil rights, upon the basis of race, and cunningly devised to defeat legitimate results of the war, under the pretence of recognizing equality of rights, can have no other result than to render permanent peace impossible, and to keep alive a conflict of races, the continuation of which must do harm to all concerned.").

of High Point, on into the banking and retail centers of Charlotte, ending in the textile mill country of Gastonia, and dissecting at least 12 counties in the process.[3] The very shape of the district belies any possible contention by the State Defendants that they employed "sound districting principles" in the implementation of their reapportionment plan. In fact, they make no pretense of such a contention. In our evaluation of the Rule 12(b)(6) motion, this disregard for "sound districting principles" must be combined with the fact that in order to favor a district traversing piedmont North Carolina, the General Assembly rebuffed 1) the "significant interest on the part of the minority community in creating a second majority-minority congressional district in North Carolina.... [f]or the south-central to southeast area," *ante*, at 463–64 (quoting Letter of John R. Dunne, Assistant Attorney General, Civil Rights Division, to Tiare B. Smiley, Special Deputy Attorney General, State of North Carolina (Dec. 18, 1991)), and 2) the proposals of the Attorney General, the North Carolina Republican Party, and some number of nonpartisan groups. *See id.* at 463–64 and n. 3.

These facts augur a constitutionally suspect, and potentially unlawful, intent on the part of the State Defendants. Moreover, the majority assumes that, because the North Carolina General Assembly is controlled by a white majority, the State Defendants could not have held an invidious discriminatory intent against Plaintiffs. *Ante*, at 472. I question the validity of such an assumption. The shift of the proposed minority-majority district from south-central or southeast North Carolina to the piedmont area of the State and the contorted shape of the Twelfth District could be indicative of a racial animus against eastern North Carolina black voters or piedmont North Carolina white voters. *See Garza v. County of Los Angeles*, 918 F.2d 763, 771 (9th Cir.1990) (although

redistricting done primarily to protect incumbents, the fragmentation of the Hispanic voting population as the avenue to achieve that goal caused the unlawful discriminatory effect). Given notice pleading, Plaintiffs should be allowed to demonstrate, if they can, the existence of impermissible intent.

## B

I have other concerns about the dispositiveness of the *U.J.O.* plurality opinion in the instant case. First, the *U.J.O.* plurality, relying on the fact that the race-conscious reapportionment at issue was confined to the boundaries of Kings County, New York, rejected the Petitioners' claims of unfair representation because unaltered white majority districts still outnumbered the reapportioned nonwhite majority districts, thereby assuring, assuming voting along racial lines, a continued majority of white elected representatives in Kings County. *U.J.O.*, 430 U.S. at 166, 97 S.Ct. at 1010 (plurality opinion). "The effect of the reapportionment on whites in districts where nonwhite majorities have been increased is thus *mitigated* by the preservation of white majority districts in the rest of the county." *Id.* at 166 n. 24, 97 S.Ct. at 1010 n. 24 (emphasis added).

I do not believe that this mitigation at the county level is equally applicable on the more geographically diverse statewide level. If a voter in the coastal First District of eastern North Carolina, for whatever reason, feels his or her interests are best represented by a certain Representative, there is little chance that the voter will be placated by the suggestion that a Representative from the mountainous Eleventh District in western North Carolina shall adequately represent his or her interests.

> [Legislators] represent people, or, more accurately, a majority of the voters in their districts—people with identifiable needs and interests which require legislative representation, and which can often

---

3. There is a notable incongruity in the fact that, in creating two new federal congressional districts, the General Assembly wilfully truncated so many North Carolina counties, when the North Carolina Constitution forbids similar

fragmented methods of districting for the reapportionment of State representatives. N.C.Const. art. II, § 5(3) ("No county shall be divided in the formation of a representative district....").

be related to the geographical areas in which these people live. The very fact of geographic districting, the constitutional validity of which the Court does not question, carries with it an acceptance of the idea of legislative representation of regional needs and interests.

*Lucas v. Forty-Fourth Gen. Assembly,* 377 U.S. 713, 750, 84 S.Ct. 1459, 1481, 12 L.Ed.2d 632 (1964) (Stewart, J., dissenting). Over against any such mitigating effect on the statewide level is the greater likelihood that two voters of different races in a given geographically compact district will share the same interests and concerns and elect a mutually agreeable Representative, irrespective of race.

Second, the race-conscious reapportionment at issue in *U.J.O.* was implemented on the basis of nonwhite majorities, which the plurality defined as including blacks, Hispanics, and Asian Americans. *U.J.O.,* 430 U.S. at 149–50 & n. 5, 97 S.Ct. at 1001–02 & n. 5 (plurality opinion). Because the Attorney General's objection to the initial redistricting in the instant case cited the General Assembly's failure to "give effect to *black and Native–American* voting strength in [south-central to southeast North Carolina]," *ante,* at 463 (quoting Letter of John R. Dunne, Assistant Attorney General, Civil Rights Division, to Tiare B. Smiley, Special Deputy Attorney General, State of North Carolina (Dec. 18, 1991) (emphasis added)), the merit of the State Defendants' motion to dismiss cannot be weighed solely on considerations of the black/white voting strength dichotomy. North Carolina's cultural diversity also encompasses Native Americans, including sizable populations of Cherokee Indians in western North Carolina and Lumbee Indians in southeastern North Carolina. To my knowledge, there is no "politically cohesive, geographically insular minority group," *Thornburg v. Gingles,* 478 U.S. 30, 49, 106 S.Ct. 2752, 2766, 92 L.Ed.2d 25 (1986), of Native Americans centered in piedmont North Carolina through which

the Twelfth District snakes. Discovery in this area of facts might flesh out Plaintiffs' claims.

## C

Furthermore, I believe the majority has discerned a *lex nemini operatur iniquum* defense in reapportionment cases from the *U.J.O.* plurality opinion that simply is not present in that opinion. *See ante,* at 471 n. 8 (citing *U.J.O.,* 430 U.S. at 164–65, 97 S.Ct. at 1009–10 (plurality opinion)). In Part III of Justice White's opinion, joined by Justices Brennan, Blackmun, and Stevens, the plurality noted that "Petitioners have not shown that New York did more than accede to a position taken by the Attorney General that was authorized by our constitutionally permissible construction of § 5." *U.J.O.,* 430 U.S. at 164, 97 S.Ct. at 1009 (plurality opinion). The position taken by the Attorney General and acceded to by the New York legislature, as set forth in the preceding paragraph of the *U.J.O.* opinion and the factual summary presented by Justice White, concerned only the 65% nonwhite majority district size to be achieved by the new reapportionment plan. *See id.* at 152, 97 S.Ct. at 1003 ("A staff member of the [New York] legislative reapportionment committee testified ... he 'got the feeling [from Justice Department officials] ... that 65 percent would probably be an approved figure'...."), Id. at 164, 97 S.Ct. at 1009 ("We think it was reasonable for the Attorney General to conclude in this case that a *substantial* nonwhite population majority—in the vicinity of 65%— would be required to achieve a nonwhite majority of eligible voters.") (emphasis in original).

My reading of these passages suggests a more fact-specific inquiry on the issue of constitutionality, emphasizing the specific actions taken by a State legislature in response to the Attorney General's discretionary construction of § 5. Where the State's reapportionment plan simply codifies *in toto* the Attorney General's deci-

sions on reapportionment, a presumption of constitutionality may be properly inferred from the legitimacy and deference accorded the Attorney General's performance of his statutory responsibilities.[4] *Morris,* 432 U.S. at 506 n. 23, 97 S.Ct. at 2421 n. 23 ("Congress—like the courts—operates on the assumption that the Attorney General of the United States will perform faithfully his statutory responsibilities."). In *U.J.O.,* the New York legislature expanded the size of the nonwhite majorities in the districts in question so as to satisfy the 65% floor suggested by the Attorney General. *U.J.O.,* 430 U.S. at 151–52, 97 S.Ct. at 1002–03.

In my opinion, however, no presumption of constitutionality or lack of invidious discrimination should attach to a reapportionment plan where, as happened here, the State legislature disregarded the Attorney General's discretionary and, therefore judicially unassailable, prescriptions for reapportionment in North Carolina.

In the instant case, the North Carolina General Assembly did revise the first redistricting plan, as required by the Attorney General. The State Defendants claim that "[t]he General Assembly chose to meet what it understood to be the Attorney General's objections...." State Defendants' Memorandum of Law in Support of Motion to Dismiss at 2. However, as noted by the majority, *see ante,* at 463–64 & n. 2, 3, the General Assembly ignored the proposals of the Attorney General and numerous partisan and nonpartisan groups by creating a second nonwhite majority district transecting piedmont North Carolina. In other words, the General Assembly intentionally disregarded the Attorney General's con-

struction of § 5, as it applied to North Carolina's geographic minority concentrations and voting trends, in favor of its own predilections. While the Attorney General did not object to the General Assembly's second reapportionment plan, *see, e.g., Morris,* 432 U.S. at 506–07, 97 S.Ct. at 2421–22 (Attorney General's preclearance does not preclude traditional constitutional challenges); *Mississippi State Chapter, Operation Push v. Allain,* 674 F.Supp. 1245 (N.D.Miss.1987) (Attorney General's preclearance does not preclude challenges under the Voting Rights Act), *aff'd,* 932 F.2d 400 (5th Cir.1991), the second plan did not codify *in toto* the Attorney General's reapportionment decision for North Carolina, and is ineligible for the *Morris* court's presumption of validity inferred from the Attorney General's pre-apportionment performance of his statutory responsibilities.

Moreover, "[t]here is no indication whatever that [the second plan] ... was in any way related—much less necessary—to fulfilling the State's obligation under the Voting Rights Act as defined in *Beer,*" namely to avoid " 'a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise.' " *U.J.O.,* 430 U.S. at 183, 97 S.Ct. at 1018 (Burger, C.J., dissenting) (quoting *Beer v. United States,* 425 U.S. 130, 141, 96 S.Ct. 1357, 1363, 47 L.Ed.2d 629 (1976)). The legislative discretion exercised by the North Carolina General Assembly, in purposeful disregard of the Attorney General's recommendations to the contrary, cannot be presumptively constitutional or free from invidious discrimination, for it was invoked and implemented pursuant to an unknown legislative intent that can be ascertained fully only by the fruition of discovery and trial in the instant case.[5]

---

**4.** In light of the Supreme Court's recent decision in *Presley v. Etowah County Comm'n,* —— U.S. ——, 112 S.Ct. 820, 117 L.Ed.2d 51 (1992), I do not express any opinion as to the inviolateness of such a presumption. *See Presley,* —— U.S. at ——, 112 S.Ct. at 831 ("Deference does not mean acquiescence. As in other contexts in which we defer to an administrative interpretation of a statute, we do so only if Congress has not expressed its intent with respect to the question,

and then only if the administrative interpretation is reasonable.").

**5.** Insulation of a State legislature's exercise of power from federal judicial review "is not carried over when state power is used as an instrument for circumventing a federally protected right." *Gomillion v. Lightfoot,* 364 U.S. 339, 347, 81 S.Ct. 125, 130, 5 L.Ed.2d 110 (1960).

## III

For the reasons enumerated *supra,* I am unable to find beyond doubt that these Plaintiffs can prove no set of facts in support of their claim which would entitle them to relief. In the instant case, the Voting Rights Act has been used to create minority-leveraged congressional districts so devoid of shape, both in absolute terms and in terms of traditional North Carolina districts, and so "uncouth" and "bizarre" [6] in configuration, as to invite ridicule. *See, e.g.,* "Political Pornography—II," Wall St. J., Feb. 4, 1992, at A14 (describing North Carolina's new congressional district map as "political pornography" and "computer-generated pornography"); "Review & Outlook: Political Pornography," Wall St. J., Sept. 9, 1991, at A10 (same). To know this, one may simply inspect their computer-drafted labyrinthine convolutions superimposed upon a map of North Carolina. These districts are justified, according to the State Defendants, on grounds that the raw black/white numbers come out right, ending the inquiry. We are not presented for scrutiny, however, with facts including just what numbers were used, or why.

Moreover, it could hardly have been the intent of Congress to permit elevation of the racial criterion to the point of exclusion of all other factors of constitutional dimension, such as contiguity, compactness,[7] and communities of interest, which bear on the rights of these Plaintiffs. Certainly this Court should not ignore such factors, nor should it give the constitutional nod to the State Defendants' acts and motives such as they may be, in arriving at these strange contours, without development of the evidence and a full record.[8]

In view of the plain proscription of the fifteenth amendment that States shall not abridge the right to vote on the basis of race, it is not surprising that the court in *South Carolina v. Katzenbach* called the Voting Rights Act "an uncommon exercise of Congressional power," suggesting that it lies at the outer reaches of permissible law. *South Carolina v. Katzenbach,* 383 U.S. 301, 334, 86 S.Ct. 803, 821, 15 L.Ed.2d 769 (1966). The demonstration by the Plaintiffs thus far shows that the instant case lies at the outer reaches of permissible facts under the law, at best. It demands, by virtue of the constitutional sensitivity of the issues, that the Plaintiffs be allowed to engage in discovery and elicit at least some evidence to allow this trial court to determine whether permissible limits have been breached.

Because Congress provided a mechanism for race-conscious reapportionment when it enacted the Voting Rights Act, but gave little guidance beyond the statement of purpose, it falls upon the courts to set forth constitutionally valid standards by which such reapportionment may be most effectively and equitably implemented. *See, e.g., U.J.O.,* 430 U.S. at 172–73, 97 S.Ct. at 1013–14 (Brennan, J., concurring in part) ("Once it is established that circumstances exist where race may be taken into account in fashioning affirmative policies, we must identify those circumstances, and further, determine how substantial a reliance may be placed upon race.") (footnote

---

**6.** *Karcher v. Daggett,* 462 U.S. 725, 762, 103 S.Ct. 2653, 2676, 77 L.Ed.2d 133 (1983) (citing *Gomillion, supra,* and 40 Congressional Quarterly 1190 (1982)).

**7.** " 'Without some requirement of compactness, the boundaries of a district may twist and wind their way across the map in fantastic fashion in order to absorb scattered pockets of partisan support.' " *Karcher,* 462 U.S. at 755–56, 103 S.Ct. at 2672–74 (quoting Reock, "Measuring Compactness as a Requirement of Legislative Apportionment," 5 Midwest J.Pol.Sci. 70, 71

(1961)). This observation applies equally well to allegations of racial gerrymandering.

**8.** "The lack of evidence ... is, of course, not surprising, since petitioners' case was dismissed at the pleading stage. If this kind of racial redistricting is to be upheld, however, it should, at the very least, be done on the basis of record facts, not suppositions. If the Court seriously considers the issue in doubt, I should think that a remand for further factual determinations would be the proper course of action." *U.J.O.,* 430 U.S. at 183–84, 97 S.Ct. at 1018–19 (Burger, C.J., dissenting) (footnote omitted).

omitted). It is not enough to leave these standards to the vicissitudes of "politics."

For the reasons enumerated above, I concur as to Parts I, II, III(A), IV(A), IV(B), and IV(C)(1) of the majority opinion and the Rule 12(b)(1) dismissal of the Federal Defendants. As to the remaining portions of Parts III and IV, Part V, and the Rule 12(b)(6) dismissals of the Federal and State Defendants, I respectfully dissent.