**James Arthur "Art" POPE,
et al., Plaintiffs,**

**v.**

**Daniel T. BLUE, Jr., et al., Defendants.**

**Civ. A. No. 3:92CV71–P.**

United States District Court,
W.D. North Carolina,
Charlotte Division.

April 16, 1992.

Thomas F. Ellis, Thomas A. Farr, Sean Callinicos, Maupin, Taylor, Ellis & Adams, Raleigh, NC, for plaintiffs.

Norma S. Harrell, Edwin M. Speas, Jr., H. Jefferson Powell, Tiare B. Smiley, Daniel F. McLawhorn, N.C. Dept. of Justice, Raleigh, NC, for defendants.

Before ERVIN, Chief Circuit Judge, POTTER and BRITT, District Judges.

## MEMORANDUM OPINION AND ORDER

ERVIN, Chief Circuit Judge:

The Republican Party of North Carolina, thirty registered Republicans, nine registered Democrats, and three citizens not affiliated with either party (hereinafter, collectively, "the plaintiffs") brought this action to challenge the State of North Carolina's federal congressional redistricting plan. The defendants are various state officials and agencies who participated in the adoption or implementation of the redistricting plan. The defendants' Rule 12(b)(6) motion to dismiss for failure to state a claim is pending before us. Holding that the plaintiffs have not alleged facts sufficient to state a claim, we grant the motion to dismiss with prejudice.

### I.

We first set out the factual background to this controversy. Because we are ruling on a 12(b)(6) motion to dismiss, we must take the allegations in the plaintiffs' complaint as true. *See, e.g., Finlator v. Powers*, 902 F.2d 1158, 1160 (4th Cir. 1990). Thus, we summarize the allegations of the complaint as follows.

Before the 1970's, North Carolina was essentially a one-party state, with Democrats controlling the state government in all respects. That situation changed in the 1970's, as voters elected the first Republican governor and the first Republican United States Senator in this century. Republican successes continued in the 1980's. Currently, four of North Carolina's eleven United States Representatives, one of its two United States Senators, and its governor are Republicans. Registered Democrats outnumber registered Republicans by a two-to-one ratio.

The 1990 census showed that North Carolina's population had grown, entitling the state to a twelfth seat in the United States House of Representatives. The North Carolina General Assembly first passed redistricting legislation on July 9, 1991. According to the complaint, Democratic majorities in both the state house and senate prevented Republicans from having any influence in the redistricting process. The state's Republican governor was also unable to prevent Democratic gerrymandering, because North Carolina is the only state without gubernatorial veto power. The first redistricting legislation created one district with a majority of black voters, located in northeastern North Carolina. In order to protect white Democratic congressmen at the expense of Republicans, the General Assembly had to make that district very contorted. The state then submitted the proposed redistricting legislation to the United States Department of Justice ("DOJ") for preclearance, which the Voting Rights Act of 1965 requires.

On December 18, 1991, the DOJ objected to the legislation because the state had not shown that its failure to create a second minority district did not impermissibly dilute minority voting strength. In response, after one day of deliberation, the General Assembly passed the redistricting legislation at issue here, Chapter 7 (Extra Session 1991) (hereinafter "the Plan"), on January 24, 1992. The Plan creates a second minority district ("District 12") that snakes diagonally across North Carolina in a thin, 160 mile long band, connecting black neighborhoods from Durham to Gastonia. District 12 is so narrow that for much of its length it only encompasses Interstate 85. As a result of District 12 and other features of the Plan, many precincts, counties, and

towns in North Carolina are divided among two or even three congressional districts. Many of the plaintiffs live in areas that are so affected. In creating the Plan, the Democratic majority rejected more compact plans that both Republicans and non-partisan groups had offered.

The Plan creates districts that are as equally populated as is mathematically possible. Seven of the districts have a population of 552,386, and the other five districts have a population of 552,387. On February 6, 1992, the DOJ approved the Plan.

## II.

In their complaint, the plaintiffs raise challenges to the Plan under a number of different constitutional provisions. We will address each of these arguments in turn.

■ The plaintiffs' primary contention is that the Plan violates their rights under the Fourteenth Amendment of the United States Constitution. The relevant part of that Amendment states: "nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 2.[1]

■ Under the law as most recently interpreted by the Supreme Court, we must consider the plaintiffs' equal protection claim as presenting a justiciable issue. In *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Court first acknowledged the justiciability of equal protection

claims in relation to legislative districting. *Baker* itself, and the majority of cases subsequent to *Baker*, involved challenges to districts that were unequal in population. *E.g., Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). In other cases, the Court recognized the justiciability, even in the absence of population deviations among the districts, of claims of racial gerrymandering. *See United Jewish Orgs. of Williamsburgh, Inc. v. Carey*, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977); *Wright v. Rockefeller*, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964). Most recently, in *Davis v. Bandemer*, 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986), a majority of the Court ruled that an equal protection claim resulting from a purely political gerrymandering scheme presented a justiciable issue.

■ In granting the justiciability of political gerrymandering claims, however, a plurality of the *Bandemer* Court outlined stringent requirements for what could constitute a viable cause of action. Due to the fact that a minority of the Court opposed a finding of justiciability under any circumstances, this plurality opinion must be considered controlling as the position which concurs in the judgment on the narrowest grounds. *See Badham v. March Fong Eu*, 694 F.Supp. 664, 668–69 (N.D.Cal.1988), *aff'd mem.*, 488 U.S. 1024, 109 S.Ct. 829, 102 L.Ed.2d 962 (1989).[2]

---

**1.** Plaintiffs contend that the Plan infringes their right to vote in violation of the Due Process Clause of the Fourteenth Amendment in addition to the Equal Protection Clause. However, the complaint does not allege that plaintiffs have, by any means, been deprived of their right to vote, only that their vote, as a result of the Plan, has been devalued relative to other voters in the state. We believe that this claim properly falls under the Equal Protection Clause and, consistent with Supreme Court precedent, we will discuss the claim solely in relation to that provision. *See, e.g., Reynolds v. Sims*, 377 U.S. 533, 557, 84 S.Ct. 1362, 1379, 12 L.Ed.2d 506 (1964) ("We indicated in *Baker* ... that the Equal Protection Clause provides discoverable and manageable standards for use by lower courts in determining the constitutionality of a state legislative scheme."). To the extent that

the plaintiffs argue that the Plan violates the Fourteenth Amendment Due Process Clause as the vehicle of incorporation for other substantive constitutional rights, we discuss these claims below.

**2.** We note that, unlike a denial of certiorari, a summary affirmance by the Supreme Court, pursuant to the exercise of its appellate jurisdiction, creates precedential authority binding on the lower courts. *See* 12 Moore's Federal Practice ¶ 400.05–1. We recognize that it is the judgment, not necessarily the reasoning, of the lower court's opinion that is affirmed by the Supreme Court's summary action. *See Mandel v. Bradley*, 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977). Nevertheless, due in particular to the fact that the *Bandemer* Court was unable to agree on a majority opinion, we

■ The *Bandemer* plurality ruled that, as in the racial gerrymandering cases, it is necessary for a plaintiff to "prove both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group." 478 U.S. at 127, 106 S.Ct. at 2808. In the present case, the complaint makes abundant allegations regarding the discriminatory intent of the General Assembly in its crafting of the serpentine legislative districts. Taking the allegations of the complaint as true, we have no trouble in finding that the Plan was designed with at least a partial purpose of disadvantaging a specific political group.[3] As the *Bandemer* plurality acknowledged, "As long as redistricting is done by a legislature, it should not be very difficult to prove that the likely political consequences of the reapportionment were intended." *Id.* 478 U.S. at 129, 106 S.Ct. at 2809.

It is on the issue of discriminatory effect that we find the plaintiffs' complaint insufficient to state a valid claim. Recognizing that redistricting is an inherently political process, the *Bandemer* plurality rejected the notion that unconstitutional discriminatory effect could be shown by "the mere fact that a particular apportionment scheme makes it more difficult for a particular group in a particular district to elect the representatives of its choice." *Id.* at 131, 106 S.Ct. at 2810. Instead, the plurality ruled that discriminatory effect in political gerrymandering cases would only be found "when the electoral system is arranged in a manner that will consistently degrade a voter's or a group of voters' influence on the political process as a whole." *Id.* at 132, 106 S.Ct. at 2810. *Bandemer* reversed a three-judge panel that had invalidated a redistricting scheme based largely on the disproportionate representation of a political party resulting after a single election under that scheme. The Court held that a plaintiff group must prove "a history (actual or projected) of disproportionate results" in conjunction with indicia that the group has "essentially been shut out of the political process." *Id.* at 139, 106 S.Ct. at 2814. The *Badham* court, in a decision subsequently affirmed by the Supreme Court, took an expansive view of "the political process as a whole." That court dismissed under Rule 12(b)(6) an equal protection claim premised on political gerrymandering, noting the lack of any allegations regarding interference in the "registration, organizing, voting, fundraising, or campaigning" of the purportedly disadvantaged group. 694 F.Supp. at 670. In the present case, the plaintiffs have relied exclusively on claims of disproportionate representation to advance their equal protection argument. The complaint alleges that the "denial and abridgement of plaintiffs' constitutional rights has occurred because [the Plan] serves primarily to further the interests of white incumbent Democratic Congressmen in avoiding competitive elections at the expense of the rights of those citizens living in the disfavored geographic locations." Complaint, ¶ 91. The gravamen of the plaintiffs' action is that the Plan adopted by the Democratic legislature will result in disproportionately high representation for the Democratic Party in the state's congressional delegation.

We note that in *Bandemer* the plurality held that the results of a single election were insufficient to establish discriminatory effect. Here, we do not even have a single election to corroborate the plaintiffs' allegations of disproportionate representation. Nevertheless, taking the allegations of the complaint as true, we grant that the plaintiffs could, theoretically, prove that

believe that the *Badham* court's interpretation of *Bandemer,* subsequently summarily affirmed by the Supreme Court, is entitled to substantial deference.

**3.** Perplexingly, as noted above, a substantial minority of the plaintiffs in this case are registered as members of the Democratic Party or as Independents. Inclusion of these plaintiffs substantially detracts from the plaintiffs' status as an "identifiable group." In the ensuing papers and at oral argument on this motion, plaintiffs exclusively advanced the theory that their "identifiable group" consisted of Republican voters. We will assume that the plaintiffs' action is premised on this theory, as it is the only coherent theory on which this litigation could advance.

the Plan would establish a "projected history" of disproportionate results.

■ The plaintiff's complaint fails under the second prong of the test for discriminatory effect as outlined by *Bandemer* and *Badham*. The plaintiffs do not allege, nor can they, that the state's redistricting plan has caused them to be "shut out of the political process." First, as conceded in the complaint, a number of "safe" Republican districts have been created by the Plan. Complaint, ¶ 76. In addition, we recognize the principle, as articulated in *Bandemer*, that "the power to influence the political process is not limited to winning elections." 478 U.S. at 132, 106 S.Ct. at 2810. As *Bandemer* points out, "An individual or a group of individuals who votes for a losing candidate is usually deemed to be adequately represented by the winning candidate and to have as much opportunity to influence that candidate as other voters in the district." *Id.* Plaintiffs do not allege that Republicans in the Democratic majority districts are precluded from influencing the actions of their Congressmen. Finally, as in *Badham*, there are no allegations that "anyone has ever interfered with Republican registration, organizing, voting, fund-raising, or campaigning." 694 F.Supp. at 670. To the extent that the plaintiffs allege disruption in these electoral activities, the disruptions are alleged to be caused by the distorted and elongated shapes of the electoral districts. However, such disruptions fall indiscriminately on individuals within the allegedly disadvantaged group and individuals outside the group, and thus cannot form the predicate for an equal protection claim.[4]

When challenged at oral argument to point to specific portions of their complaint that alleged the requisite exclusion from the political process, plaintiffs continually referred to their exclusion from the process of redistricting. Plaintiffs found particu-

larly significant the fact that North Carolina's governor does not possess the power to veto legislation, placing the redistricting power wholly in the hands of the invariably Democrat-dominated state legislature. In emphasizing this circumstance, the plaintiffs misconstrue the required showing for purposes of proving discriminatory effect.

■ The Republicans' exclusion from the process of redistricting is relevant to the discriminatory *intent* of the designers of the Plan. The fact that the Plan was allegedly crafted without meaningful Republican checks and balances is certainly probative as to the General Assembly's purported anti-Republican bias. However, under the requirements of *Bandemer* for showing discriminatory *effect*, the plaintiffs must show that they have been or will be consistently degraded in their participation in the entire political process, not just in the process of redistricting. *See Bandemer*, 478 U.S. at 132, 106 S.Ct. at 2810. Neither the Republican party nor any other identifiable group conceivably represented by the plaintiffs in this case can make this showing. As a result, we hold that plaintiffs' complaint does not state a viable equal protection claim as outlined by the Supreme Court in *Davis v. Bandemer*.

■ The plaintiffs' second contention is that the Plan violates Article I, Section 2 of the Constitution, which states that "[t]he House of Representatives shall be composed of Members chosen every second Year by the People of the several States." Under prior Supreme Court cases, the plaintiffs' claim is without basis, because:

> [T]he Court has made it clear that Article I, Section 2 only proscribes districts of unequal population. Claims regarding the political makeup of those districts must be judged by the more rigorous

---

**4.** In fact, according to the complaint, the least compact of the districts, District 12, is comprised of approximately 56% black voters and is expected to be solidly Democratic. Complaint, ¶ 78. Interference with normal organizing and campaigning activities could be expected to be particularly acute in this district, which spans

the state's three largest media markets and stretches over 160 miles. Plaintiffs cannot take comfort from this fact, because at no point did the plaintiffs purport to represent an "identifiable group" consisting exclusively of District 12 voters.

standards of the Fourteenth Amendment, as outlined in *Davis v. Bandemer.* *Badham*, 694 F.Supp. at 674–75. There is no Article I, Section 2 violation here. The Plan creates seven districts with an equal population (552,386) and five districts that vary by only one person (552,387). Greater population equality among the districts is impossible.

In their complaint, the plaintiffs argue that the General Assembly could program a computer to create several redistricting plans that had equipopulous districts, complied with the Voting Rights Act, and in addition formed compact, contiguous districts. While this may be true, the Constitution does not require it. The Supreme Court has often recognized that redistricting is an inherently political process. *See, e.g., Bandemer*, 478 U.S. at 128, 106 S.Ct. at 2808 ("[p]olitics and political considerations are inseparable from districting and apportionment") (quoting *Gaffney v. Cummings*, 412 U.S. 735, 753, 93 S.Ct. 2321, 2331, 37 L.Ed.2d 298 (1973)). While requiring the General Assembly to adopt nonpartisan, computer-generated districts might be a good idea, it clearly goes beyond what the Constitution mandates.

Next, the plaintiffs claim that the Plan violates the First Amendment by either creating a "chilling effect" on their freedom of speech or limiting their freedom of association. Neither position states a cause of action. First, the *Badham* court considered and rejected the same "chilling effect" argument:

> The concept of a "chilling effect" is associated with the doctrine of overbreadth, and describes the situation where persons whose expression is protected are deterred from exercising their rights by the existence of an overly broad statute regulating speech. *See, e.g., New York v. Ferber*, 458 U.S. 747, 768, 772 & n. 27, 102 S.Ct. 3348, 3360, 3362 & n. 27, 73 L.Ed.2d 1113 (1982). While plaintiffs may be discouraged by their lack of electoral success, they cannot claim that [the redistricting plan] regulates their speech or subjects them to any criminal or civil

penalties for engaging in protected expression.

*Badham*, 694 F.Supp. at 675. We agree with the *Badham* court's analysis and find it dispositive as to our plaintiffs' "chilling effect" claim. Second, the Fourth Circuit has previously rejected a freedom of association claim in *Washington v. Finlay*, 664 F.2d 913 (4th Cir.1981). *Washington* was a vote dilution case in which the plaintiffs challenged an at-large election system. In discussing the freedom of association claim in *Washington*, the court stated:

> The first amendment's protection of the freedom of association and of the rights to run for office, have one's name on the ballot, and present one's views to the electorate do not also include entitlement to success in those endeavors.... Where, as here, the only challenged governmental act is the continued use of an at-large election system, and where there is no device that directly inhibits participation in the political process, the first amendment, like the thirteenth, offers no protection of voting rights beyond that afforded by the fourteenth and fifteenth amendments.

664 F.2d at 927–28. We believe the reasoning and holding in *Washington* apply equally here. Because there is no "device that directly inhibits participation in the political process," the plaintiffs' freedom of association claim boils down to the argument that they are entitled to political success. *Washington* rejected that position, and we hold as in *Washington* that the plaintiffs' freedom of association claim is coextensive with the equal protection claim that we address above.

The plaintiffs' fourth cause of action alleges that the Plan violates the First Amendment's Petition Clause. The First Amendment guarantees "the right of the people ... to petition the government for a redress of grievances." The plaintiffs have completely failed to show that the Plan has any effect on their right of petition. In fact, this cause of action merely restates the plaintiffs' freedom of association argument:

[The Plan] impermissibly interferes with and dilutes the rights of plaintiffs as members of certain identifiable and cognizable geographic, jurisdictional and political communities of interest to communicate with each other on important issues of public policy, and to associate with each other in the expression and advocacy of opinions on those issues to their elected representatives.

Complaint, ¶ 110. We reject the plaintiffs' right-of-petition cause of action for the same reason we discuss above.

■■■ Finally, the plaintiffs claim that the Plan violates the Fourteenth Amendment's Privileges or Immunities Clause. Section 1 of the Fourteenth Amendment states:

All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States....

The plaintiffs' claim is that "the configuration of [the Plan] is so unusual and egregious that it places plaintiffs at an electoral disadvantage not suffered by voters in other states with more rational districts." Plaintiffs' Mem.Supp.Prelim.Inj. & Opp. Mot. to Dismiss at 54. The argument presupposes that the Privileges or Immunities Clause protects a citizen's right to live in a regularly shaped congressional district.

We find no precedent to suggest that the Privileges or Immunities Clause protects such a right. While the history and language of the clause indicate that Congress intended it to have broad application, "courts rarely rely upon [it] to protect the privileges of citizens." Laurence H. Tribe, *American Constitutional Law* 548 (1988). Tribe notes that commentators treat the clause as "essentially dormant" and that a Supreme Court Justice once called it "the almost forgotten ... clause." *Id.* n. 4 (*citing Colgate v. Harvey*, 296 U.S. 404, 443, 56 S.Ct. 252, 265, 80 L.Ed. 299 (Stone, J., dissenting)). In fact, the Supreme Court overruled *Colgate*, the only case in which a

Court majority has ever held that a state provision violated the Privileges or Immunities Clause, in *Madden v. Kentucky*, 309 U.S. 83, 60 S.Ct. 406, 84 L.Ed. 590 (1940). While Tribe and others urge litigants to "treat the clause as alive and potentially robust," he concedes that "[i]n sum, the privileges or immunities clause appears technically redundant—so far." Tribe, *supra*, at 558–59. We see no legal basis for breathing new life into the clause.

### III.

The Supreme Court has recognized and has consistently accepted the view that redistricting is an inherently political process. While members of the minority political party in any redistricted state may be apt to bemoan their fate, they can take solace in the fact that even the best laid plans often go astray: "In order to gerrymander, the legislative majority must weaken some of its safe seats, thus exposing its own incumbents to greater risks of defeat.... [A]n overambitious gerrymander can lead to disaster for the legislative majority." *Bandemer*, 478 U.S. at 152, 106 S.Ct. at 2820 (O'Connor, J., concurring) (citation omitted).

It is tempting to agree with the contention at oral argument that, just by showing the court a map of North Carolina's new congressional districts, the plaintiffs must have stated some cause of action. However, prior Supreme Court decisions have wisely counseled us to resist that temptation. Until we hear otherwise from a higher authority, we ORDER that defendants' motion to dismiss the plaintiffs' complaint be GRANTED with prejudice.

POTTER, District Judge, dissenting.

I believe the complaint filed by the Plaintiffs contains sufficient allegations of both discriminatory intent and effect to withstand the Defendants' Rule 12(b)(6) motion to dismiss. I would allow the Plaintiffs an opportunity to put on their evidence. As such, I respectfully dissent.