REPUBLICAN PARTY OF NORTH CAROLINA; Bruce Briggs; William R. Sigmon; Marvin K. Gray; R. Howard Riddle; Lloyd Fowler; Joe R. Wilson; R. Walter White; Edgar A. Readling, Jr.; Frederic M. Gallagher; Ralph A. Walker, Plaintiffs–Appellants,

v.

James B. HUNT, Jr., Governor of North Carolina; North Carolina State Board of Elections; William Marsh, Jr., Chairman of North Carolina State Board of Elections; Gregg O. Allen; M.H. Hood Ellis; Ruth Turner Semashko; June K. Youngblood; North Carolina Association of Black Lawyers, Defendants–Appellees,

and

Durham County Board of Elections; Forsyth County Board of Elections; Guilford County Board of Elections, Defendants.

No. 91–1741.

United States Court of Appeals, Fourth Circuit.

April 27, 1993.

## ON PETITION FOR REHEARING WITH SUGGESTION FOR REHEARING IN BANC

Appellees have filed a petition for rehearing with suggestion for rehearing in banc and appellants filed an answer to the petition. A member of the Court requested a poll on the suggestion for rehearing in banc, and a majority of the judges voted to deny rehearing in banc. Judges WIDENER, PHILLIPS and MURNAGHAN voted to rehear the case in banc and Judge PHILLIPS wrote the attached dissent. Judges RUSSELL, HALL, WILKINSON, WILKINS, NIEMEYER, HAMILTON, LUTTIG and WILLIAMS voted against rehearing in banc. Chief Judge ERVIN disqualified himself from participation.

The original judicial panel voted to deny the petition for rehearing.

The Court denies the petition for rehearing with suggestion for rehearing in banc.

Entered at the direction of Judge WILKINS for a panel consisting of Judge RUSSELL, Judge WILKINS and Judge GLEN M. WILLIAMS, Senior United States District Judge, sitting by designation.

PHILLIPS, Circuit Judge, dissenting from denial of rehearing en banc:

In 1986, a severely divided Supreme Court in *Davis v. Bandemer,* 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986) opened a narrow door of justiciability for claims by political parties (and possibly their crossover allies) that their group voting power had been unconstitutionally degraded by partisan political gerrymandering of *legislative* districts and, having opened that outer door but narrowly, opened an even narrower door for the *prima facie* statement and proof of such a particularized claim. Significantly, the claim initially found justiciable by a six to three majority of the *Bandemer* Court was then thought by four of those who had thought it justiciable (and three who disagreed on that point) not, however, proven *prima facie* under the more stringent substantive sufficiency test. Though discriminatory intent by the state legislature was so palpable as not to be seriously questioned, *see id.* at 127, 140–41, 106 S.Ct. at 2807, 2814 and though there was considerable evidence of adverse effect from the gerrymander upon the challenging political party's proportionate success at the polls, *see id.* at 134, 106 S.Ct. at 2811, it was not sufficient in degree to establish an equal protection violation under the Court's demanding test. *See id.* at 134–143, 106 S.Ct. at 2811–16.

A common theme runs through each of the three different viewpoints expressed in the four separate *Bandemer* opinions. Concerns of federalism and separation of powers mandate that, if they are to exist at all, the occasions for federal court consideration of claims of partisan political gerrymandering by state legislatures must be strictly confined. *See id.* at 129–134, 143 & n. 14, 106 S.Ct. at 2809–11, 2832 & n. 14 (plurality opinion) (though such claims justiciable, stringent *prima facie* claim test required in view of "peculiar characteristics of these political gerrymandering claims" and "the delicacy of intruding on this most political of legislative functions"); *id.* at 144, 106 S.Ct. at 2816 (Burger, J., concurring in judgment) (not justiciable; claims of "injustice" from political gerrymandering do not "belong" with federal judiciary); *id.* at 144, 106 S.Ct. at 2816 (O'Connor, J., concurring in judgment) (same; "judiciary should leave [such claims] to the legislative branch"); *id.* at 184–85, 106 S.Ct. at 2838 (Powell, J., dissenting) (though claims justiciable in general and instant one proven, difficulties of adjudicating such claims by "federal judges ... ill-equipped generally to review legislative [districting] decisions" requires that courts "impose a heavy burden of proof" on parties making such claims).

Since *Bandemer* was decided in 1986 until now, neither the Supreme Court nor, I believe, any other lower federal court than ours had opened wider the narrow doors of justiciability and substantive claim defined by the *Bandemer* Court until the panel decision in this case. That decision has now opened both wider in ways that I believe are unwarranted under controlling Supreme Court authority. Unless corrected, the decision will work great constitu-

tional mischief of exactly the sort recognized by every Justice who wrote in *Bandemer* as the special threat to federalism and separation of powers posed by this particular type of attack on state legislative functions.

I think we should do the correcting, and do it now. If we do not, and unless the Supreme Court were to undertake review of our judgment of reversal and remand at this time, the result will be to send this case back to the district court under a mandate which, with all respect, I believe is unmanageable—precisely because it is unmoored from even the concededly uncertain moorings of *Bandemer. See id.* at 185 n. 25, 106 S.Ct. at 2838 n. 25 (Powell, J., dissenting) (pointing out that because of the division of views within the court "there is no 'Court' for a standard that should be applied in determining whether a challenged redistricting plan is an unconstitutional partisan political gerrymander"). In consequence, later correction, whether by this Court of the Supreme Court, will have been at the expense of a great deal of essentially unguided effort by both court and parties, one of them a sovereign state, (and possibly by that state's legislature) in a real political thicket which the district court wisely had seen was one into which it should not go. For this reason, I dissent from the court's decision not to rehear en banc the appeal in this case.

### I

The first and fundamental error in our panel's decision is its reading of *Bandemer's* narrow justiciability holding to include claims respecting the election of state judges. I believe that, properly read, *Bandemer* confines the justiciability of claims of partisan political gerrymandering to those involving the election of legislative officials. While *Bandemer* does not expressly say so (having no need to) all the pointers on which we commonly rely are in that direction.

The prime pointer is found in the Supreme Court's only direct consideration of a *constitutional* voting rights claim related to the election of judges. In *Wells v.*

*Edwards,* 409 U.S. 1095, 93 S.Ct. 904, 34 L.Ed.2d 679 (1973) the Court summarily affirmed a three-judge district court decision that the claim, there of one-person, one-vote violation, was not a justiciable one. While such a summary affirmance does not of course foreclose later, full consideration of the dispositive issue by the Supreme Court, *Bandemer,* 478 U.S. at 121, 106 S.Ct. at 2804, the decision affirmed and its rationale are binding on this court until that happens. It has not yet. Indeed, the continued authority of *Wells* recently has been expressly recognized by the Supreme Court in *Chisom v. Roemer,* —— U.S. ——, ——, 111 S.Ct. 2354, 2368, 115 L.Ed.2d 348 (1991).

It therefore is presently the law of the land, hence of this circuit, that because state judges, where elected, are not elected to provide the people with "representative government," a claim that the process by which they are elected violates the constitutional one-person, one-vote principle is not a justiciable one—that principle simply being "not relevant to the makeup of the judiciary." *Wells v. Edwards,* 347 F.Supp. 453, 455–56 (M.D.La.1972), *aff'd mem.,* 409 U.S. 1095, 93 S.Ct. 904, 34 L.Ed.2d 679 (1973). I believe that *Wells'* rationale for the non-justiciability of one-person, one-vote claims respecting judicial elections necessarily extends as well to the nonjusticiability of group vote-dilution claims respecting such elections. I do not see how, if having one's individual vote in judicial elections denied equal weight to that of all others in the voting constituency is not the subject of a justiciable constitutional claim, having an identifiable political group's voting power in such elections "diluted" by partisan political gerrymandering could be. The one is no more nor less relevant to "preserv[ing] a truly representative government" under the *Wells* rationale.

I therefore read *Wells* as holding directly, and by necessary implication from the rationale of the lower court decision it affirmed, that no constitutional challenge to a state's districting decisions respecting the election of its judges could present a justiciable controversy, whether based on one-

person, one-vote or on group vote-dilution grounds.

*Bandemer's* later holding that equal protection challenges by political parties to state districting decisions respecting the election of legislators *do* present justiciable controversies does not undercut this reading of *Wells.* It would do so only if the necessary implication of its justiciability holding was that it embraced judicial as well as legislative elections. I believe the plurality and concurring opinions on which the *Bandemer* holding is based instead imply the opposite: that it is limited by its rationale, by its tone, and by the precedent upon which it relies, to claims respecting legislative elections.

The *Bandemer* holding, an extremely cautious one on any reading, is expressly grounded in a late-developed constitutional voting rights jurisprudence that was solely concerned with the unique threat posed to truly representative government by state apportionment and districting decisions affecting the make-up of the very legislative bodies that are the indispensable core of that form of government and the ultimate instrument through which minority groups may effectively "fend [ ] for themselves" in the political processes of a state. *Bandemer,* 478 U.S. at 152, 106 S.Ct. at 2820 (O'Connor, J., concurring in the judgment). It is inconceivable to me that the one-person, one-vote principles of *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) and *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), or even the racial group vote dilution principles of *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) and *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971) would ever have originated in response to constitutional challenges respecting the makeup of state judiciaries. *Wells* of course is direct evidence that they would not have, and *Bandemer's* rationale, directly drawn from those seminal voting rights decisions, *see Bandemer,* 478 U.S. at 118–27, 106 S.Ct. at 2803–07, confirms that its holding too is totally dependent upon the fact that there too it was the make-up of legislative bodies, hence of legislative power, that was at stake. The whole tone of the *Bandemer* plurality opinion (and of the concurring opinion providing the justiciability holding) is one of great caution and anxiety about extending federal judicial oversight of the apportionment/districting functions of state legislatures past the few points of absolutely felt necessity—all concerned with the composition of legislative bodies—that had now been identified in *Baker, White,* and *Bandemer.* I believe it is implicit in *Bandemer* that it would not have been written in response to a partisan political gerrymandering challenge to a state's process for electing its judiciary.

*Chisom,* in which the Court recently held that amended § 2 of the Voting Rights Act did "cover" judicial elections, does not undercut this reading of *Wells* and *Bandemer.* Our panel's decision relies upon *Chisom* as demonstrating on the one hand that *Bandemer's* justiciability holding respecting legislative elections extends as well to judicial elections, *see* at 953, n. 17, and, on the other, that *Wells'* nonjusticiability holding respecting judicial elections is confined to one-person, one-vote challenges, *see* at 954. But this reliance is, with respect, simply misplaced. Both suggestions are directly refuted or necessarily belied by the *Chisom* opinion itself.

As to the suggestion that *Chisom's* discussion of § 2 "coverage" of judicial elections "applies to claims pursued under the Equal Protection Clause," at 953 n. 17, the *Chisom* Court was at pains to disclaim any relevance of its analysis of the concededly broader reach of § 2's coverage to the reach ("justiciability") of related constitutional voting rights protections. *Chisom,* — U.S. at —, —, 111 S.Ct. at 2361, 2368.

The panel's suggestion that *Chisom's* recognition of *Wells'* continued authority on the nonjusticiability of challenges to judicial elections was confined to one-person, one-vote challenges is belied by the *Chisom* Court's discussion of the point. That aspect of *Wells* was addressed in *Chisom* only in response to the state-defendants' suggestion that because *Wells* had found one-person, one-vote claims respecting judi-

cial elections nonjusticiable, this precluded § 2 coverage of such elections, since consideration of § 2 vote-dilution claims required an initial determination whether one-person, one-vote principles had been observed in the challenged districting plans. *See Chisom,* —— U.S. at ——, 111 S.Ct. at 2368. The *Chisom* Court rejected the argument by pointing out that § 2 claims of racial vote dilution could be made out irrespective of the observance of one-person, one-vote requirements. *Id.* n. 32. This of course says nothing about the breadth of *Wells'* nonjusticiability holding, but simply points out the irrelevance of that holding to questions of § 2's "coverage".

A proper parsing of the Supreme Court decisions in *Wells, Bandemer,* and *Chisom* thus clearly points to the nonjusticiability of any claim by a political party that a state's districting design for election of its judges, as opposed to its legislators, violates any constitutionally secured group voting right of the party. The only group voting rights recognized to date by the Supreme Court as entitled to constitutional protection against dilution by a state's electoral districting design—hence as potential subjects of justiciable controversies—are those of identifiable racial and political groups respecting the election of legislators. At this point, this defines the limit of constitutionally secured group voting rights, hence of justiciable constitutional claims by racial or political groups of voters. To the extent state districting designs for the election of other officials may be thought to result in unfairness or injustice to identifiable racial or political (or other?) groups of voters, rectification has been left by the Supreme Court's voting rights jurisprudence to the political processes of the states (subject always of course to Congress' constitutional enforcement powers in respect of racial groups).

Even if *Bandemer's* justiciability holding were construed to extend to claims respecting the election of judges, the claim here would not meet the most critical aspects of *Bandemer's* justiciability test: that the claim be subject to resolution by the application of "judicially discernible and manageable standards" and that its resolution

not require the making of an "initial policy decision that the judiciary should not make." *Bandemer,* 478 U.S. at 123, 125, 106 S.Ct. at 2806, 2806. The *Bandemer* majority concluded that the partisan political gerrymandering claim there in issue could be resolved under the equal protection standards developed and applied in the one-person, one-vote and racial vote-dilution cases, *id.* at 123–25, 106 S.Ct. at 2806 and, seemingly, that the only "initial policy decisions" required to resolve the claim were ones ensuring "fair representation" for identifiable groups of voters which were not decisions "of a kind clearly for nonjudicial discretion." *Id.* at 125–26 & n. 9, 106 S.Ct. at 2807 & n. 9. Disagreeing on this critical point, three Justices thought that racial vote-dilution standards could not properly be applied to political party claims, that nonjudicial policy determinations would be required to resolve political gerrymandering controversies. *Id.* at 155–161, 106 S.Ct. at 2822–25 (O'Connor, J., concurring in judgment).

Of course the *Bandemer* majority holding on this issue controls but, with respect, I believe that every judicial management difficulty pointed out by Justice O'Connor's concurring opinion that would result from the attempt to transpose racial vote-dilution standards to political group vote-dilution cases would be magnified past the acceptable point where, as here, the transposition would also be from claims respecting legislative districting to claims respecting judicial elections. And indeed I do not believe that the transposition could be made to the particular context of this case—North Carolina's electoral process for election of its superior court judges—without making an "initial policy decision" about the structural design of the state's judicial system that clearly is one "not for the federal judiciary to make." My reasons are as follows.

A unique, critical feature of contemporary group vote-dilution jurisprudence (the source, per *Bandemer,* of whatever standards would be available in this case) is that the existence of a dilution-by-districting (or failure-to-district) violation can only

be determined by identifying electoral districts which would not violate the group's voting rights because in those district they would constitute effective voting majorities. A state's failure so to have districted thus constitutes the violation, and the appropriate remedy is a requirement that it now do so. In this somewhat unusual decisional process, the availability of remedy thus effectively determines the existence of right—and its violation. *See Growe v. Emison,* —— U.S. ——, ——, 113 S.Ct. 1075, 1085, 122 L.Ed.2d 388 (1993); *Thornburg v. Gingles,* 478 U.S. 30, 50 n. 17, 106 S.Ct. 2752, 2766 n. 17, 92 L.Ed.2d 25 (1986). Critical to this process for resolving vote-dilution claims, therefore, is a court's ability to determine with sufficient precision two things: the identity of the group claiming violation of its rights—so that its numbers, hence its potential voting strength, can be determined; and the appropriate geographical areas within which its potential voting strength so calculated is to be measured.

These two interrelated proof requirements present problems difficult enough in the racial vote-dilution cases concerned with legislative districting out of which they originated. In the quite different context of a political group's vote-dilution challenge to a state's design for electing judges, I believe the problems are essentially intractable, that there are no "judicially discernible and manageable standards" for resolving them.

The problem of defining—sufficiently to count its numbers—the group claiming dilution of its voting strength in this case is that it includes, by its own definition, not just Republicans but an indeterminate number of sometime allied non-Republican voters. The reason the group so defines itself is obvious: only so could it identify a significant number of appropriately configured judicial districts in which the group would constitute effective voting majorities. It is true that *Bandemer* held that racial group vote-dilution standards could be applied to political group claims notwithstanding the latter group could not be identified as could a racial group by the immutability of its members' defining characteristic. *Bandemer,* 478 U.S. at 125, 106 S.Ct. at 2806. But nothing in *Bandemer* denies the increased difficulty which this element of indeterminacy creates for identifying, in order to number its members, a political group claiming vote dilution. Indeed, the *Bandemer* Court expressly noted the difficulty but was able to avoid addressing and giving guidance on it by its decision to dismiss the claim on the merits. *See id.* at 134–35 & n. 15, 106 S.Ct. at 2811 & n. 15. In consequence, because the problem has not been presented in racial vote-dilution cases and has been avoided in the Supreme Court's one political vote-dilution decision, there is presently no authoritative guidance upon it for the base-line federal courts.

The basic difficulty thus unaddressed is of course obvious: how does a court determine the consistently reliable voting strength of a political party's non-party voting allies for particular electoral offices? Obviously there are some voting record data from which inferences may be attempted (claimants here point to judicial district primary election records) but these are fraught with proof problems, (e.g., how many elections? occasional allies or only "true believers"?) *see id.,* and the inferences possible, if allowable at all, are a far cry from the exactitude possible in the racial vote-dilution cases that supply the only available standards.

In this case, the indeterminacy of group identity, hence voting strength, is exacerbated by comparable or even greater indeterminacy with respect to the other, interrelated element in the dilution equation, the geographical areas within which voting strength is to be measured. Indeed, the geographical area problem in this case, unlike that in legislative districting cases, is judicially unmanageable in the ultimate sense: it cannot be resolved except by making an "initial policy decision"—here one concerning the basic structure of a state's judicial system—that is "not for judicial decision".

To show why requires a brief analysis of the exact vote-dilution claims in issue, and of the way it impacts under vote-dilution jurisprudence on the state's judicial sys-

tem. The claim here is actually an attack on the state's at-large design for the election (as opposed to primary nomination) of its superior court judges. The remedy sought is the classic one that has evolved in voting rights jurisprudence for successful challenges to at-large and multi-member district electoral designs: require election by districts in some of which the otherwise "submerged" groups constitute effective voting majorities.

Identifying appropriate remedial districts for local or state legislative elections can of course present very difficult judicial problems whose resolution has serious impact on a state's electoral processes and on the immediate racial or political-party makeup of the legislative body. *See e.g., Gingles.* But in the end, that is the extent of such a remedy's impact: it doesn't affect any fundamental state policy respecting the very structure of its legislative bodies—whether they shall be unicameral or bicameral, the qualification for holding the offices, or the like.

Not so with respect to the impact of the judicial districting remedy sought here. A decision that North Carolina must abandon its historic process of state-wide election of its superior court judges would affect not just that electoral process and the immediate political party mix of these judgeships, but a critical structural feature of the state's judicial system. Central to that structure since 1875 has been the constitutional provision for the "rotation" of superior court judges for sittings over a wider territory than that of their districts of residence. N.C. Const. Art. IV, § 9. This fundamental policy—asserted in the Constitution as a "salutary one that should be continued", *id.*—is based on a perception that the justice system will be best served by de-localizing these trial courts of general jurisdiction—specifically to minimize the accumulating influence of local connections upon the judges. This is a unique structural feature rarely found in state court systems. Whatever one may think of its merits, it represents a fundamental policy choice respecting the structure of this critical trial-level component of the state's judicial system. Critical to its implementation is the companion choice to let the voters of the entire state rather than just those of a judge's district of residence (the nominating constituency) participate in the election of those judges. While it is of course technically possible to retain the rotation system without state-wide election, the two are so intimately related in concept that it is difficult to believe that the rotation system could be thought any longer justified if voters in the wider area of rotation were not allowed to participate in the selection of these judges.*

Consequently, a complete localizing of this electoral process would be tantamount, as a practical matter, to the rejection of so critical a feature of the rotation system that the policy's abandonment in time would likely be assured. Such a remedy therefore would affect North Carolina's constitutional organization of its judiciary—a "decision of the most fundamental sort for a sovereign entity", *Gregory v. Ashcroft,* —— U.S. ——, ——, 111 S.Ct. 2395, 2400, 115 L.Ed.2d 410 (1991) (age-qualification for state judicial offices) that might well be invulnerable to the limitations on state power imposed by the Fourteenth Amendment. *Id.* at ——, 111 S.Ct. at 2405. Surely it represents at least an initial policy decision of the sort "not for judicial discretion" that epitomizes the nonjusticiable political question.

There is yet one more problem of "discernible and manageable judicial standards" to be considered in this case that might well alone determine its nonjusticiability. Resolution of the Republican Party's vote-dilu-

---

* Though under the state constitution rotation could be statewide, the state legislature is empowered to provide for less extensive areas of rotation within judicial divisions of its creation. Responding to increased dockets and other factors affecting the logistics of rotation, the legislature over time has increased the divisions from two to the present four, thereby cutting back the rotation areas from roughly half the state to a fourth. This of course simply further complicates the problem of identifying the appropriate geographical areas for measuring group voting strength in this case. As claimants here point out, the state might have an argument at least for division-wide elections if not for state-wide.

tion claim here would take place in the context of North Carolina's recent realignment of judicial districts in response to a Voting Rights Act suit—to create a number of "safe" black voter majority districts for purposes of primary *nomination*. As Justice O'Connor pointed out in her *Bandemer* concurrence, one inevitable consequence of opening the door to vote-dilution claims by political parties in addition to those by racial groups would be an "increase in the number of competing claims to equal representation [that] will make judicial review ... vastly more complex." *Bandemer*, 478 U.S. at 156, 106 S.Ct. at 2822. That added complexity is absolutely guaranteeable in this case were it to be allowed to proceed further. Indeed it is difficult to imagine how a court would approach the problem of accommodating the inevitable claims of black voters at least to retain the "safe" nomination districts recently created in response to their Voting Rights Act suit, with the competing claims of the Republican Party for "safe" districts for *final* election purposes in this case. The effort is sufficiently mind-boggling to demonstrate on that account alone the absence of judicially manageable standards for the task.

## II

Even if political party claims of vote dilution respecting judicial elections were justiciable, the claim here should have been dismissed for substantive insufficiency. The panel decision erred in finding the claim as stated a cognizable one under the substantive test laid down in *Bandemer*. That test, avowedly a more stringent one than that applied in other equal protection contexts, *see Bandemer*, 478 U.S. at 134 n. 14, 106 S.Ct. at 2811 n. 14, would find unconstitutional discrimination through partisan political gerrymandering only when an "electoral system is arranged in a manner that will consistently degrade a voter's or a group of voters' influence on the political process *as a whole*." *Id.* at 132, 106 S.Ct. at 2810 (emphasis added). By this test, the court expressly sought to confine judicial intrusions into this "most political of legislative functions", *id.* at 143,

106 S.Ct. at 2816, to only those cases in which a challenged districting plan is alleged to have had, or immediately to threaten, effects "sufficiently serious to require intervention by the federal courts." *Id.* at 134, 106 S.Ct. at 2811.

*Bandemer's* rejection of the claim in that case, and the Court's discussion of the test it applied, make plain the only situation it would think "serious" enough to "require" such judicial intervention. It would exist only where a partisan political gerrymandering process had worked, or assuredly soon would work, an effective destruction of the power of the affected minority political party even to "influence" the political processes of the state to the point of insuring responsiveness to its interests on the part of majority party legislators. *See id.* at 131–32, 106 S.Ct. at 2809–10. Because only in that dire situation could it be assumed that the minority political group had effectively lost its power any longer to protect itself through the voting franchise, only that situation is serious enough to warrant judicial intervention to insure equal protection with respect to laws affecting exercise of that franchise. Critical to the existence of such a drastic situation is that the degradation of the minority political group's influence on the political process must extend to that "process as a whole." *See id.* at 132, 143, 106 S.Ct. at 2810, 2815.

As the panel decision implicitly recognizes, dramatic successes in state-wide elections by the North Carolina Republican Party (and its cross-over allies) in recent years would make meeting this requirement impossible if "as a whole" refers to the whole range of the state's political processes. *See* pp. 957 (noting that Republican candidates had won election as Governor in three of the last five elections, as United States Senator in four of the last seven, presently hold four of the state's eleven seats in the United States House of Representatives, and have had other successes in state-wide elections).

The panel avoids the consequence of such a literal reading by dismissing it in a footnote aside. *Id.* at 956, n. 24. Citing

no decisional authority in support, the panel holds that "as a whole" in the *Bandemer* formulation refers narrowly only to the "whole" of an electoral process under specific challenge, here that for electing the state's superior court judges. *Id.*

That reading, with all respect, is wholly at odds with *Bandemer's* description of the degree of degradation of a political party's voting power from partisan political gerrymandering that is serious enough to warrant federal judicial intervention. So far as I know, it stands alone among the decisions that have considered the matter. Indeed, the Supreme Court recently and in rapid order has summarily affirmed three three-judge court decisions expressly rejecting this narrow reading of the critical phrase, "as a whole". *Pope v. Blue*, 809 F.Supp. 392 (W.D.N.C.1992) (three-judge court), *aff'd mem.* —— U.S. ——, 113 S.Ct. 30, 121 L.Ed.2d 3 (1992); *Fund for Accurate and Informed Representation, Inc. v. Weprin*, 796 F.Supp. 662, 668–69 (N.D.N.Y.) (three-judge court), *aff'd mem.* —— U.S. ——, 113 S.Ct. 650, 121 L.Ed.2d 577 (1992); *Badham v. Eu*, 694 F.Supp. 664, 670–71 (N.D.Cal. 1988) (three-judge court), *aff'd mem.* 488 U.S. 1024, 109 S.Ct. 829, 102 L.Ed.2d 962 (1989); *see also Holloway v. Hechler*, 817 F.Supp. 617 (S.D.W.Va.1992) (three-judge court), *aff'd mem.*, —— U.S. ——, 113 S.Ct. 1378, 122 L.Ed.2d 754 (1993).

I do not believe that *Bandemer* contemplated federal court intervention in behalf of a political party as demonstrably capable of fending for itself in a state's political processes as is the contemporary Republican Party in North Carolina. That it may have been unable—even if by intentional thwarting of its efforts—to elect candidates for judgeship on one trial court in the state's judicial system is not the type of egregious effect on its general power to influence the overall political processes of the state that *Bandemer* required.

### III

In summary.

The only claims of group vote-dilution by districting that present justiciable controversies rather than nonjusticiable political questions are claims by racial groups, or by political parties respecting legislative elections. Claims by political parties of vote-dilution respecting judicial elections are not justiciable. This is the import of the holdings in *Wells* and *Bandemer*. The claim in this case should have been dismissed—as it was by the district court—on that basis.

Even if vote-dilution claims respecting judicial elections may, like those respecting legislative elections, be sometimes justiciable under *Bandemer's* rationale, the particular claim in this case is not. Due to the particular nature of the claim and of the challenged electoral process, there are no "judicially manageable standards" to determine with sufficient precision either the identity of the political group seeking relief or the appropriate geographical areas (judicial districts) within which to measure its group voting strength. Furthermore, resolving the claim against the state would require a federal court to make an initial policy decision respecting the state's organization of its judicial system that is not for the judiciary. Finally, the complexities resulting from the need in adjudicating this political group's dilution claim to accommodate the necessarily conflicting voting rights of black voters respecting the offices in question would in themselves defy the application of judicially manageable standards.

Even if such claims may in particular circumstances be justiciable and if in this circumstance the claim was justiciable, it should have been dismissed for failure to state a claim under *Bandemer's* substantive test. It did not allege—could not allege—a sufficient degradation of the Republican Party's "influence on the political process as a whole" to warrant federal court intervention to insure fairer representation of Republicans in the office of state superior court judge.